# AGNEW *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF FLORIDA.

No. 447. Submitted November 13, 1896. — Decided January 11, 1897.

When a person is notified that his case is to be brought before a grand jury, he should proceed at once to take exception to its competency, and if he has had no opportunity of objecting before bill found then he may raise the objection by motion to quash or by plea in abatement; but in all cases he must take the first opportunity in his power to make the objection. In this case the venire issued November 18; a second venire December 2; the court opened December 3; the indictment was returned December 12; the plea in abatement was filed December 17. *Held*, that it was too late.

An exception was saved as to the taking of notes by a juryman; but, as the record does not show that any notes were taken, there is nothing for it to rest on.

On the trial of the president of a national bank, indicted for misapplication of its funds, its cashier testified in his favor as to his financial condition and standing. He was then asked — "do you know what his commercial rating was at that time?" The question being objected to was ruled out. *Held*, that the ruling was correct.

The same witness on cross-examination was asked why he had resigned his position as cashier at a date named, which was after the acts com-

plained of and before the indictment. The question being objected to was admitted. *Held*, that there was no error in this.

The question at issue being what was the defendant's knowledge and opinion of his own financial condition evidence as to the opinion of others on that point was properly excluded.

The opinions of the financial world as to the rating or standing of the defendant when the acts complained of were committed were not admissible in evidence.

In criminal cases, the burden of establishing guilt rests on the prosecution from the beginning to the end of the trial; but when a *prima facie* case has been made out, the necessity of adducing evidence then devolves on the accused.

The instruction of the trial court to the jury in this case that "if you find that the defendant placed that which was worthless or of little value among the assets of the bank at a greatly exaggerated value and had that exaggerated value placed to his own personal account upon the books of the bank, from such finding of fact you must necessarily infer that the intent with which he did that act was to injure or defraud the bank, but this inference or presumption is not necessarily conclusive," was not error.

The trial court is not bound to accept language which counsel employ in framing instructions, nor to repeat instructions already given in different language.

The court instructed the jury that "the crime of making false entries by an officer of a national bank with the intent to defraud, defined in the Revised Statutes of the United States, section 5209, includes any entry on the books of the bank which is intentionally made to represent what is not true or does not exist, with the intent either to deceive its officers or to defraud the association. The crime may be committed personally or by direction. Therefore the entry of a slip upon the books of the bank, if the matter contained in that deposit slip is not true, is a false entry. If the statement made upon the deposit slips is false, the entry of it in the bank and the books of the bank is false" and refused to give the following, asked for by defendant; "The making of a false entry is a concrete offence which is not committed where the transaction entered actually took place and is entered exactly as it occurred. . . . The truthful entry of a transaction charged as fraudulent does not constitute a false entry within the meaning of the statute." *Held*, that there was no error.

The evidence or want of evidence justified the refusals to give the instructions requested by defendant's counsel, and referred to in No. 10, in the opinion of this court; and in regard to those referred to in No. 11, the true view of this branch of the case was fairly covered by the charge of the trial court.

PLAINTIFF in error was indicted in the United States Circuit Court for the Southern District of Florida for violation of section 5209 of the Revised Statutes, which is as follows:

"Sec. 5209. Every president, director, cashier, teller, clerk or agent of any association, who embezzles, abstracts or wilfully misapplies any of the moneys, funds or credits of the association; or who, without authority from the directors, issues or puts in circulation any of the notes of the association; or who, without such authority, issues or puts forth any certificate of deposit, draws any order or bill of exchange, makes any acceptance, assigns any note, bond, draft, bill of exchange, mortgage, judgment or decree; or who makes any false entry in any book, report or statement of the association, with intent, in either case, to injure or defraud the association or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of any such association; and every person who with like intent aids or abets any officer, clerk or agent in any violation of this section, shall be deemed guilty of a misdemeanor, and shall be imprisoned not less than five years nor more than ten."

The indictment contained eight counts, charging that Agnew, being president of the First National Bank of Ocala, Florida, unlawfully misapplied the moneys, funds and credits of the bank with intent to convert them to his own use, and to injure and defraud the bank, by causing a check for $3400 belonging to the bank to be entered as a credit on his personal account with the bank, his account at the time being largely overdrawn, and he being largely indebted to it: That he caused a false entry of $3400 to be made to his credit on the books of the bank by means of a false deposit slip which he caused to be made in his own favor with the intent on his part to injure and defraud the association: That he embezzled and converted to his own use, with the intent to injure and defraud the association, moneys and assets thereof to the amount of $2500: That he unlawfully misapplied the moneys, funds and credits of the association with intent to convert them to his own use, and with intent to injure and defraud the association, in this, that he purchased for the bank certain bonds of the par value of $5000, of the Globe Phosphate Mining and Manufacturing Company, paying for them the

sum of $2500, and, without the knowledge and consent of the banking association, placed the bonds among its assets, and caused them to be credited to his personal account on the books of the bank at the sum of $5000, knowing the bonds to be entirely worthless and of no commercial value, and thus wilfully misapplied the moneys, funds and credits of the bank to the amount of $2500, and converted the same to his own use: That he feloniously embezzled and converted to his own use $7500 of the moneys, funds and credits of the bank with intent to injure and defraud it: That he unlawfully and wilfully misapplied the moneys, funds and credits of the bank, with intent to convert the same to his own use and to injure and defraud the bank by purchasing, acting ostensibly for it, certain bonds of the Globe Phosphate Mining and Manufacturing Company of the par value of $10,000, for $2500, and, without the knowledge and consent of the bank, placing said bonds among the assets of the bank as a part thereof, and causing the sum of $10,000 to be credited to his own personal account on the books of the bank, he then and there well knowing that the bonds were worthless and of no commercial value, and thus wilfully misapplying and converting to his own use $7500 of the moneys, funds and credits of the association: That he embezzled and converted to his own use, with intent to injure and defraud the association, $7500 of the bank's moneys and assets: That he unlawfully and wilfully misapplied the moneys, funds and credits of the bank with intent to convert the same to his own use and to injure and defraud the bank by purchasing $10,000 of the Globe Phosphate Mining and Manufacturing Company's bonds for $2500, placing them without the knowledge and consent of the association among the assets of the association at $10,000, and causing the sum of $10,000 to be placed to his personal credit on the books of the association, knowing said bonds to be worthless and of no commercial value, thus wilfully misapplying and converting to his own use $7500 of the moneys, funds and credits of the bank with the aforesaid intent.

The indictment was returned December 12, and plaintiff in

error was arraigned December 17, 1895, and filed a plea in abatement as follows:

"And the said Enoch W. Agnew in his own proper person comes into court here and, having heard the said indictment read, says that the grand jury which found said indictment was an illegal grand jury, in this, that after sixteen had failed to attend upon the regular venire the court ordered that a special venire issue for ten grand jurors to be drawn according to law; said grand jurors so ordered by the court were directed to be taken from the county of Duval; that the clerk and marshal in drawing said venire, whenever a name was legally drawn from the box, if said party so drawn was not from the county of Duval, laid aside said name and continued drawing until ten names from the county of Duval were obtained, and which illegal drawing of said venire tended to the prejudice of this defendant, and the court, on excusing three returned on the second venire, ordered that four names be drawn for jurors to complete the panel; that said jurors were ordered to be drawn from the box, and the clerk and marshal drawing the same were ordered to take those that were from Duval County as they came from the box, and the said clerk and marshal, as the names were drawn, rejected and did not place on the venire said names so drawn, but rejected and laid them aside until names came out of the box of parties resident of Duval County, which drawing was illegal and tended to the prejudice of the defendant; and, upon said venire being returned showing A. K. Leon and Julius Kaufman summoned and Alex. Sabel and Frank Robinson not found, the court ordered that four names be drawn from the box and in said order directed that said four names should be taken from the county of Duval; that the said United States marshal and clerk, in obedience to said order, drew from the box more than four names, and where the names were of persons not resident of Duval County rejected and laid them aside and continued drawing until Dennis A. Andreu, Benjamin F. Manier, John L. Marvin, and Samuel Morris were drawn, and so John L. Marvin, John E. Onley, Z. L. Anderson, Charles E. Bell, W. G. Candlish, A. R. Paxon,

and Dennis A. Andreu were drawn illegally by said marshal and clerk and not in accordance with the statute of the United States in such case made and provided, which requires that where less than sixteen attend the court shall order the marshal to summon from the body of the district, and not from the bystanders, a sufficient number of persons to complete the grand jury. And so the names of many persons who were duly drawn from the jury-box were not placed upon the venire, but were, in the pursuance of the aforesaid orders, after being drawn from the box, rejected and laid aside by the clerk and marshal drawing the same for the purpose of completing the grand jury from the residents of the county of Duval; and the defendant says that he was entitled to have the said grand jury completed according to law; and the said grand jury so empanelled and sworn as aforesaid was not drawn and empanelled in accordance with the statutes of the United States providing for the drawing and empanelling of grand juries, but was illegal; and this defendant says that such drawing tended to his injury and prejudice.

"Wherefore he prays judgment of the said indictment, and that the same may be quashed."

To this plea the United States filed a demurrer, and issue being joined thereon, the court, after argument, held the plea insufficient, to which plaintiff in error excepted and pleaded not guilty. The cause was set for trial on January 3, on which day a jury was empanelled; the trial proceeded with, and a verdict of guilty returned January 7. Motions for new trial and in arrest of judgment were submitted and denied; and sentence thereupon pronounced and the cause brought here on writ of error.

*Mr. Eleazer K. Foster* for plaintiff in error.

*Mr. Solicitor General* for defendants in error.

Mr. Chief Justice Fuller, after stating the case, delivered the opinion of the court.

Nineteen errors were assigned, of which the third, fifth, ninth and fourteenth were abandoned, and the sixth and seventh, the twelfth, sixteenth and seventeenth, and the eleventh and fifteenth were argued by counsel for plaintiff in error together.   We will examine these alleged errors in their order.

1. That the court erred in sustaining the demurrer to defendant's plea in abatement.

Section 802 of the Revised Statutes is as follows : " Jurors shall be returned from such parts of the district, from time to time, as the court shall direct, so as to be most favorable to an impartial trial, and so as not to incur an unnecessary expense, or unduly to burden the citizens of any part of the district with such services."

Under section 803, writs of *venire facias*, when directed by the court, were to issue from the clerk's office and be served and returned by the marshal in person or by his deputy; or in case the marshal or his deputy were incapacitated, by some fit person specially appointed by the court.

By section 804, when, from challenges or otherwise, there was not a petit jury, it was provided that the marshal or his deputy should, by order of the court, return jurymen from the bystanders sufficient to complete the panel.

Section 808 reads thus : " Every grand jury empanelled before any district or circuit court shall consist of not less than sixteen nor more than twenty-three persons.   If of the persons summoned less than sixteen attend, they shall be placed on the grand jury, and the court shall order the marshal to summon, either immediately or for a day fixed, from the body of the district, and not from the bystanders, a sufficient number of persons to complete the grand jury.   And whenever a challenge to a grand juror is allowed, and there are not in attendance other jurors sufficient to complete the grand jury, the court shall make a like order to the marshal to summon a sufficient number of persons for that purpose."

By the act of June 30, 1879, c. 52, 21 Stat. 43, it was provided that all jurors, grand and petit, " including those summoned during the session of the court, shall be publicly drawn

from a box containing, at the time of each drawing, the names of not less than three hundred persons, possessing the qualifications prescribed in section eight hundred of the Revised Statutes, which names shall have been placed therein by the clerk of such court and a commissioner, to be appointed by the judge thereof. . . . The clerk and said commissioner each to place one name in said box alternately, without reference to party affiliations, until the whole number required shall be placed therein. But nothing herein contained shall be construed to prevent any judge from ordering the names of jurors to be drawn from the boxes used by the state authorities, in selecting jurors in the highest courts of the State."

The plea sets up as ground for abatement of the indictment that after the original venire had been exhausted without obtaining sixteen grand jurors, the court ordered a special venire to issue for ten grand jurors to be drawn according to law, "to be taken from the county of Duval; that the clerk and marshal in drawing said venire, whenever a name was legally drawn from the box, if said party so drawn was not from the county of Duval, laid aside said name and continued drawing until ten names from the county of Duval were obtained," and that some of the ten returned on the second venire being excused, other names were drawn in the same way, and a third venire was issued, and still another, until the grand jury was completed with grand jurors from Duval County. The original venire showed that twenty-three persons were summoned from ten counties, not including the county of Duval, one or more from each, and the plea stated that when a deficiency appeared from the failure of some of those summoned to attend, the court directed the deficiency to be made up by obtaining jurors from Duval County in the manner pointed out. There are certain orders of court certified as part of the record, which directed the drawing according to law from the various counties exclusive of Duval County, and then from that county. It will be perceived then that the jurors were all drawn from the body of the district, and so distributed as not to incur unnecessary expense, or unduly burden the citizens of any part of the district with jury service.

Section 802 of the Revised Statutes was brought forward from a clause of section 29 of the judiciary act of September 24, 1789, which was regarded by Mr. Justice Curtis as applicable to grand as well as petit juries. *United States* v. *Stowell*, 2 Curtis, 153. In that view we are inclined to concur, but apart from this, and without considering how far, if at all, the section may have been modified by the act of June 30, 1879, we think the plea was properly adjudged insufficient.

Such a plea must be pleaded with strict exactness. *United States* v. *Hammond*, 2 Woods, 197; *O'Connell* v. *Reg.*, 11 Cl. & Fin. 155; *Dolan* v. *People*, 64 N. Y. 485; *Jenkins* v. *State*, 35 Florida, 737; *McClary* v. *State*, 75 Indiana, 260; Whart. Cr. Pl. & Pr. § 427; Bishop New Cr. Pro. §§ 327, 745.

Dr. Wharton lays it down (Whart. Cr. Pl. & Pr. §§ 344, 350) that "material irregularities in selecting and empanelling the grand jury, which do not relate to the competency of individual jurors, may usually be objected to by challenge to the array, or by motion to quash," or by plea in abatement; that the question of the mode in which such objections are to be taken largely depends upon local statutes, but that certain rules may be regarded as generally applicable. One of these rules is that the defendant must take the first opportunity in his power to make the objection. Where he is notified that his case is to be brought before the grand jury, he should proceed at once to take exception to its competency, for if he lies by until a bill is found, the exception may be too late; but where he has had no opportunity of objecting before bill found, then he may take advantage of the objection by motion to quash or by plea in abatement, the latter in all cases of contested fact being the proper remedy. *United States* v. *Gale*, 109 U. S. 65. Another general rule is that for such irregularities as do not prejudice the defendant, he has no cause of complaint, and can take no exception. *United States* v. *Richardson*, 28 Fed. Rep. 61; *United States* v. *Reed*, 2 Blatchford, 435, 456; *United States* v. *Tallman*, 10 Blatchford, 21, 51; *State* v. *Mellor*, 13 R. I. 666; *Cox* v. *People*, 80 N. Y. 500; *People* v. *Petrea*, 92 N. Y. 128.

The original venire was issued November 18, the second

venire issued December 2, 1895. The court opened December 3, 1895, and the indictment was returned December 12, yet defendant did not file his plea in abatement until December 17. The plea does not allege want of knowledge of threatened prosecution on the part of defendant, nor want of opportunity to present his objection earlier, nor assign any ground why exception was not taken or objection made before; and, moreover, the plea is fatally defective in that, although it is stated that the drawing "tended to his injury and prejudice," no grounds whatever are assigned for such a conclusion, nor does the record exhibit any such.

2. That the court erred in allowing the jurors to take notes.

It appears from the bill of exceptions that one of the jurymen asked the court if he "could take notes and jot down any items on paper," and that the court responded: "Certainly, you have a right to assist your memory in any way that is consistent with your conscience." To which defendant excepted. The court subsequently admonished the jury that this was simply for the personal convenience of the juror; that he wished them to understand that their memory and recollection of the testimony were to control in arriving at a verdict; and that they should not be influenced in the least by the juror's notes.

The exception saved was to the permission to take notes and not to the use of them in the jury-room. But the record does not show that any notes were taken, and there is nothing for the exception to rest on.

3. That the court erred in refusing to allow the witness McIntyre to answer this question propounded by defendant's counsel: "Do you know what his [Agnew's] commercial rating was at that time?"

McIntyre was cashier of the First National Bank of Ocala at the time of the alleged criminal misapplication of its funds, and had testified fully, on behalf of plaintiff in error, as to his financial condition and standing, when he was asked this question. We hold the ruling of the court correct. The point of inquiry was Agnew's actual financial condition or what he knew or must be held to have known or actually and with

reason believed that it was, and his commercial rating was not relevant.

4. That the court erred in allowing the witness McIntyre to be asked on cross-examination why he resigned as cashier of the bank in June, 1894, and in permitting him to answer the question.

The criminal acts charged in the indictment were alleged to have been committed in January, February and May, 1894. McIntyre was cashier of the bank during that period and his resignation of that office was not accepted until June, 1894. The ground assigned for the objection was that the testimony was immaterial, and the court said : "That might be relevant and might not. If he resigned because he knew that Mr. Agnew's guarantee was not good for anything, that might be relevant."

The record thus continues:

"Q. Didn't you attempt to resign as cashier of that bank previous to the time when you did actually resign ? A. Yes sir. I offered my resignation at the regular annual meeting of the stockholders in January, 1894. Q. I will ask you why you tendered your resignation at that time as cashier of that bank ? The defendant renewed his objection to this question as immaterial ; but the court overruled the objection and allowed the question to be answered ; to which decision of the court the defendant excepted. A. I cannot state any one particular or special reason for tendering it. In 1893, during the time when all banks were having hard times, of course the banks here had hard times, and I just simply made up my mind then that until things got back to their normal condition again I was going to get out of that business right there. Q. So that your reason was just because you wanted to quit the banking business. A. I would not say that that was the reason. Q. What we want is the reason. A. I would state that, of course, it is very apparent I was not altogether satisfied with the business, that is my reason for giving it up ; I was not satisfied. I cannot state any particular. Q. You were not satisfied with the business or the manner in which the business was conducted, which ? Defendant ex-

cepted to this question. By the court: To pursue that line
of questioning would be bringing rather irrelevant and general
matters which might possibly influence the jury and which
might not be relevant in this issue unless he can state some
definite thing. Mr. Clark (district attorney): I will ask a
straight question. Q. I will ask you if it is not true that you
tendered your resignation and made up your mind to quit the
service of the bank on account of the acts and doings of Mr.
Agnew, president of the bank, similar to this bond transac-
tion. The defendant objected to this question as immaterial
and leading, but the court overruled the objection and allowed
the question to be answered; to which decision of the court
the defendant excepted. A. As I said, there was no one
special reason that I could mention that caused my resigna-
tion. By the court: If you cannot state anything definite, the
court does not want any general information or implication."

We think there was no error committed in this regard.
This witness was the officer next in rank to the president.
He had testified on defendant's behalf and his personal action
was relevant on cross-examination as testing his testimony-in-
chief. If his voluntary resignation had no connection with
the conduct of his superior officer, his answer could not be
injurious. If it had, then that fact tended to weaken any
evidence he might have given in extenuation of the action of
that officer. Besides, these answers of the witness were prac-
tically immaterial.

5. That the court erred in refusing to allow the witness
Barnett to testify as to whether he considered Agnew's
guarantee of $20,000 Globe Phosphate bonds, at the time he
made it, good, and in striking out the testimony of the witness;
and in not allowing the witness Stewart to testify as to the
rating, by Dun's Commercial Agency, of Agnew at the time
he gave the guarantee of $20,000.

McIntyre had testified that he had made out two deposit
tickets in favor of Agnew and at his request, one dated Feb-
ruary 12 and the other May 12, 1894, crediting him with de-
positing $10,000 in bonds in each instance; that the bonds
referred to were Globe Phosphate bonds; that he had the

bonds in his possession when he made out the deposit slips; that the bonds were for $10,000 each; that Mr. Agnew asked him to give him credit for the bonds, $10,000 each time; that in each instance Mr. Agnew stated that "he would be personally responsible to the bank that these bonds would be all right. He would guarantee the bank both principal and interest; that he would make a written guarantee at any time I would write it out." Witness further identified a guarantee dated February 12, 1894, as written by him, and signed by Agnew in his presence, which was read in evidence.

The witness Barnett was president of the National Bank of Jacksonville, Florida, and was called as a witness on behalf of defendant. The question put to him was: "Are you sufficiently acquainted with Mr. Agnew's standing in the spring of 1894 to testify as to whether or not you considered his obligation, guarantee or indorsement at that time good for $20,000? Mr. Clark. Wait a moment. A. Yes, sir; I considered him good." The government asked that this answer be stricken out. The court said: "Any testimony that would show positively the financial condition of Mr. Agnew at that time, not in the commercial world — the opinion of what his guarantee would be taken for by others — is not a true test of what he knew himself. The opinion of others as to his standing at that time I do not think should be introduced to determine the value of that guarantee"; and sustained the motion. The court was right in this ruling. On the question of value to Agnew's knowledge, Barnett's opinion of Agnew's responsibility was irrelevant.

The witness Stewart was the agent of R. G. Dun & Co., a commercial agency, in charge at Jacksonville, Florida. Defendant offered to show that Dun's Commercial Agency rated him at that time at a certain amount of money. The court declined to admit the evidence, and correctly ruled:

"The question in this case is what was his intent, and he knew himself what that guarantee was worth, and that guarantee was worth just as much as he would be able to make it worth in a case of emergency. The question here is not how much Mr. Agnew was worth, but the question is how much

he knew himself to be worth at that time and how good he knew his guarantee was. I consider in that case that if he had good grounds to believe that he was perfectly able to comply with that guarantee in every way and according to his own financial condition at that time — had no doubt in his own mind — I will admit that such positive evidence as that might be relevant to go to the jury to show he had no intent to injure. or defraud the bank, but what the opinions of the financial world were in regard to his condition is not the best evidence."

6. The tenth assignment alleged error in several distinct parts of the charge of the court, but in argument only one out of six exceptions saved thereto was relied on, namely, to the following.

The court advised the jury that in determining defendant's intent they might consider testimony tending to show that defendant, without notice to the board of directors, and without their knowledge or consent, had invested one half the bank's capital in the bonds in question, and then said : " The rule of law in regard to intent is that intent to defraud is to be inferred from wilfully and knowingly doing that which is illegal, and which, in its necessary consequences and results, must injure another. The intent may be presumed from the doing of the wrongful or fraudulent or illegal act, and in this case, if you find that the defendant placed that which was worthless or of little value among the assets of the bank at a greatly exaggerated value and had that exaggerated value placed to his own personal account upon the books of the bank, from such finding of fact you must necessarily infer that the intent with which he did that act was to injure or defraud the bank, but this inference or presumption is not necessarily conclusive. There may be other evidence which may satisfy the jury that there was no such intent, but such an inference or presumption throws the burden of proof upon the defendant, and the evidence upon him in rebuttal to do away with that presumption of guilty intent must be sufficiently strong to satisfy you beyond a reasonable doubt that there was no such guilty intent in such transaction."

Undoubtedly, in criminal cases, the burden of establishing

guilt rests on the prosecution from the beginning to the end of the trial.

But when a *prima facie* case has been made out, as conviction follows unless it be rebutted, the necessity of adducing evidence then devolves on the accused.

The Circuit Court, in this part of the charge, was dealing with the intent to injure and defraud the bank, and rightly instructed the jury that, if they found certain facts, such intent was necessarily to be inferred therefrom.

This was in application of the presumption that a person intends the natural and probable consequences of acts intentionally done, and that an unlawful act implies an unlawful intent. 1 Greenl. Ev. § 18; 3 Greenl. Ev. §§ 13, 14; Jones on Ev. § 23; Bishop Cr. Proc. §§ 1100, 1101; and cases cited.

The Circuit Court, however, told the jury that the presumption of the intent to injure and defraud, if the facts were found as stated, was not conclusive, but, in substance, that its strength was such that it could only be overcome by evidence that created a reasonable doubt of its correctness; in other words, that as the presumption put the intent beyond reasonable doubt, it must prevail, unless evidence of at least equivalent weight were adduced to the contrary.

The question of the particular intent was not treated as a question of law, but as a question to be submitted to the jury, and conceding that the statement of the court that the evidence to overcome the presumption must be sufficiently strong to satisfy the jury "beyond a reasonable doubt" was open to objection for want of accuracy, we are unable to perceive that this could have tended to prejudice the defendant when the charge is considered as a whole.

For the jury were further advised that if they found the facts in question, which were again rehearsed, then the necessary inference was that the transaction was effected "with intent to injure and defraud said bank, and such inference can only be overcome by evidence satisfactory to you that there was no such intent"; that "the question of the intent is to be determined by the facts and circumstances and the surroundings at the time of the transaction"; that "the intent of the

defendant at the time he committed the transaction is the question for you to determine, and in arriving at a conclusion on that intent you will carefully weigh all of the testimony in the case "; that the presumption of innocence remains with the defendant until the jury are " satisfied of the guilt beyond a reasonable doubt "; and that " if you are satisfied beyond a reasonable doubt that the transactions as charged were committed, and at the time he committed those transactions he had an intent to defraud the bank, your verdict will be one of guilty. Unless you are satisfied beyond a reasonable doubt that he had such intent, your verdict will be not guilty." And again : " The jury must be satisfied beyond a reasonable doubt as regards the guilt of the accused before they can find a verdict of guilty. By a reasonable doubt is not meant a possible doubt, but such a doubt arising from the evidence that leaves the minds of the jury in such a state that they cannot say, after having reviewed all the evidence, that they have an abiding conviction, to a moral certainty, of the guilt of the accused."

7. That the court erred in giving to the jury the following instruction : " The defendant is presumed to be innocent of all the charges against him until he is proven guilty by the evidence submitted to you. This presumption remains with the defendant until such time in the progress of the case that you are satisfied of the guilt beyond a reasonable doubt "; and in not giving the following instruction asked by defendant : " Every man is presumed to be innocent until he is proved guilty, and this legal presumption of innocence is to be regarded by the jury in this case as matter of evidence to the benefit of which the party is entitled. This presumption is to be treated by you as evidence giving rise to resulting proof to the full extent of its legal efficacy."

The court is not bound to accept the language which counsel employ in framing instructions, nor is it bound to repeat instructions already given in different language. *Ayers* v. *Watson,* 137 U. S. 584; *Grand Trunk Railway* v. *Ives,* 144 U. S. 408; *Coffin* v. *United States,* 162 U. S. 664, 672. The instruction given was quite correct and substantially covered

the instruction refused, and as to the latter the court might well have declined to give it on the ground of the tendency of its closing sentence to mislead.

In *Coffin* v. *United States*, 156 U. S. 432, 460, this court, in discussing the distinction between the presumption of innocence and reasonable doubt, said: "The fact that the presumption of innocence is recognized as a presumption of law and is characterized by the civilians as a *presumptio juris*, demonstrates that it is evidence in favor of the accused. For in all systems of law legal presumptions are treated as evidence giving rise to resulting proof to the full extent of their legal efficacy." But in that case the charge of the court was thought not to have given due effect to the presumption of innocence, which there was no failure in this case to state, and the giving of the instruction asked would have tended to obscure what had already been made plain.

8. That the court erred in giving the following instruction on behalf of the government:

"The crime of making false entries by an officer of a national bank with the intent to defraud, defined in the Revised Statutes of the United States, section 5209, includes any entry on the books of the bank which is intentionally made to represent what is not true or does not exist, with the intent either to deceive its officers or to defraud the association. The crime may be committed personally or by direction."

The exception was confined to the foregoing, but the instruction thus continued:

"Therefore the entry of a slip upon the books of the bank, if the matter contained in that deposit slip is not true, is a false entry. If the statement made upon the deposit slip is false, the entry of it in the bank and the books of the bank is false."

And in refusing to give the following instructions asked by defendant:

"The making of a false entry is a concrete offence which is not committed where the transaction entered actually took place and is entered exactly as it occurred."

"The truthful entry of a transaction charged as fraudulent

does not constitute a false entry within the meaning of the statute."

The instruction as given was correct, and in accordance with the rule indicated in *Coffin* v. *United States*, 162 U. S. 664. This being so, no error was committed in declining to give the others.

9. That the court erred in giving the following instruction:

"The law presumes that every man intends the legitimate consequence of his own acts. Wrongful acts knowingly or intentionally committed can neither be justified or excused on the ground of innocent intent. The color of the act determines the complexion of the intent. The intent to injure or defraud is presumed when the unlawful act, which results in loss or injury, is proved to have been knowingly committed. It is a well-settled rule, which the law applies in both criminal and civil cases, that the intent is presumed and inferred from the result of the action. If, therefore, the funds, moneys or credits of the First National Bank of Ocala are shown to have been either embezzled or wilfully misapplied by the accused and converted to his own use, whereby, as a necessary, natural or legitimate consequence, the association's capital was reduced or placed beyond the control of the directors or its ability to meet its engagements or obligations or to continue its business was lessened or destroyed, the intent to injure or defraud the bank may be presumed."

In our opinion there was evidence tending to establish a state of case justifying the giving of this instruction, which was unexceptionable as matter of law.

10. That the court erred in refusing to give the following instruction requested by defendant:

"If the jury shall find from the evidence that on the 15th day of April, A.D. 1895, E. W. Agnew, upon receipt of the check of the Merchants' National Bank of Savannah for $3400, used that check and the proceeds of it for the payment of a debt of the First National Bank of Ocala, then they must find upon that count in the indictment that he did not fraudulently embezzle or misapply the check or the proceeds of it."

The first count of the indictment charged that Agnew,

knowing his personal account with the bank to be largely overdrawn and that he was largely indebted to the bank, caused this check for $3400, which was the property of the bank, to be entered to his personal credit on the books of the bank and thereby made it subject to his disposal, and technically the offence would not have been, in itself, condoned by any rightful application which he may have made of that particular amount of money. And while the evidence showed that the $3400 was received from the sale of stocks belonging to the bank, it also showed that Agnew never charged himself with the $3400 and credited stock account, nor paid in that sum and made that credit, but that when the bank failed the $3400 still stood as applied on Agnew's credit and still remained an asset in the stock account. Such explanation as was attempted was so unsatisfactory that we do not think the refusal of the instruction constitutes reversible error.

11. That the court erred in not giving the following instruction asked for by defendant:

"That the written guarantee introduced and filed in evidence, signed by E. W. Agnew, and conditioned for the payment of the interest and principal of the bonds of the Globe Phosphate Mining Company was upon its face a good, legal and sufficient guarantee, and that if the jury shall find from the evidence that at the time of the delivery by E. W. Agnew to the cashier of the First National Bank of Ocala of the bonds of the Globe Phosphate Mining Company in controversy he also delivered the guarantee which has been introduced in evidence, and they shall further find from the evidence that at the time said guarantee was signed and delivered that E. W. Agnew, the defendant, was solvent and thoroughly able to respond to the obligation, and that he signed and delivered the guarantee with the knowledge of his solvency and with intent to pay the same when demand was made upon him for payment, then the jury may find from the evidence that the defendant did not invest or misapply the money arising from the sale of the said bonds with intent to defraud the association or any one else."

The Phosphate bonds were put in evidence and the record

should have contained a copy of at least one of them, but it does not, and instead there is a brief statement that they were bonds of "the Globe Phosphate Mining and Manufacturing Company, Citrus County, Florida, each of the value of one thousand dollars, payable in gold coin of the United States, in ten years from date or on call, at or after the expiration of two years from date, drawing interest at eight per cent, semi-annually, in gold coin, payable on the 15th day of December and June in each year, according to tenor of coupons attached, upon presentation and surrender of said coupons respectively; default in payment of coupons and continuing default for two months, the whole becomes due; all bearing even date and of the same tenor and same term, ten years; executed in pursuance of vote of the stockholders and board of directors; secured by first-mortgage bond upon all property of even date, present and future, acquired by the company, the right to redeem after two years being optional with the company; said bonds dated 11th December, 1893; signed by John A. Bishop and Herbert A. Bishop, the original having been withdrawn by order of the court, to be returned to the receiver of the First National Bank of Ocala."

Agnew's guarantee was in these words:

"Know all men by these presents that for and in consideration of the sum of ($5) five dollars cash in hand paid by the First National Bank of Ocala and for other good and valuable consideration I hereby guarantee to the said bank the payment on demand of both principal and interest of fifteen (15) bonds of the Globe Phosphate Mining and Manufacturing Company, numbered from one (1) to five (5), both inclusive; eleven (11) to fifteen (15), both inclusive, and twenty-one (21) to twenty-five (25), both inclusive, for one thousand ($1000) dollars each, total fifteen thousand ($15,000) dollars, and bearing interest at the rate of eight (8%) per cent per annum. It is agreed and understood that I hereby guarantee the payment of the principal of these bonds, payable on demand, with accrued interest.

"This agreement and contract is to be binding on me, my heirs, executors, administrators or assigns."

"Bonds of the Globe Phosphate Mining and Manufacturing Co. Nos. 31, 33, 35, 37, 39, 41, 43, 45, 47, 49, 51, 53, 55, 57, 59, 61, 63, 65, 67, 69, 71, 73, 75, 77 and 79 are to be included in the above guarantee, and I hereby guarantee principal and interest on all of the above-described bonds."

The evidence was to the effect that five Globe Phosphate bonds, numbered from one to five, were purchased by Agnew for the bank at fifty cents on the dollar and credited at par. But Agnew testified that he purchased them for himself. It also appeared that two lots of Globe Phosphate bonds, of $10,000 each, were purchased at twenty-five cents on the dollar, and that Agnew was credited on his personal account with $10,000, in each instance, and the bonds placed in the assets of the bank; and that the bonds were subsequently sent away to be used as collateral security, and the guarantee forwarded to be put with them. The evidence further tended to show that the bonds were of little, if any, value, and that Mr. Agnew's financial condition was such as to place his guarantee in the same category. And although Agnew testified on his own behalf he did not refer to the subject of the guaranty, or his intentions and ability in regard to it, while it appeared that the credits of these bonds were never consented to nor authorized at any meeting of the directors or stockholders.

The bonds were payable in ten years with an option to the company to pay after two years, it being also provided that for default in payment of interest, which was payable semi-annually, continuing two months, the whole might become due. If the president of the bank received a personal credit of $20,000 for these bonds, under the circumstances disclosed, the court was not required to instruct as requested that from his guaranty that the bonds and interest should be paid, the jury might find that there was no intent to injure and defraud the bank in the transaction.

The true view of this branch of the case was fairly covered by the charge of the court as follows: "There is testimony tending to show that the defendant at the time he was thus depositing the bonds, gave a guarantee that the bonds were good, and that he would guarantee the payment of principal

and interest. You can take that into consideration, and such guarantee can only be considered as determining the value of those bonds at that time and the intent of the party in such transaction. . . . As I say again, gentlemen, the only difficult question for you to determine is the intent of the accused. The question of the intent is to be determined by the facts and circumstances and the surroundings at the time of the transaction; but, gentlemen, the law presumes that every party who in any way attempts anything by any guarantee or anything of that kind which is dependent upon future successful operations, takes the risk of the success, and that if a person commits an offence with the intent of temporarily injuring or defrauding another party or a banking institution, although it may be his intent at the time to finally recompense or prevent any injury resulting from such act, he is not protected by such intent to finally correct the temporary wrong deed; or, in this case, if you are satisfied that at the time he placed those bonds there he knew that they were worthless or of a very small value and had a large value charged to the bank and placed to his account — if he did that with the intent, for the time being, to injure the bank and take a wrongful advantage of the credit of the bank, no matter if at that time he had an intent to in the future remedy any injury that might come to the bank, it would not protect him in your finding or from your finding, what the intent was at that time."

We have carefully explored the evidence and considered the errors assigned, whether pressed in argument or not, and have been unable to discover any adequate ground for the reversal of the judgment.

*Judgment affirmed.*