## ESTABROOK v. UNITED STATES.

Circuit Court of Appeals, Eighth Circuit.
August 24, 1928.

No. 7965.

LEWIS, Circuit Judge. The plaintiff in error was convicted on an indictment which charged that he "on May 18, 1926, at Kansas City in said Western Division of said Western District of Missouri,· with the design, intent and purpose then and there on the part of the said Alvah W. Estabrook to hurt, harm, injure and kill one Edward E. Porterfield, unlawfully and feloniously, in the manner and by the means hereinafter shown, did cause to be delivered by mail of the United States at the place at which it was directed to be delivered, to wit, at Kansas City aforesaid, in said Western Division of said Western District of Missouri, a certain nonmailable matter, that is to say, a certain article and composition which then and there, as he the said Alvah W. Estabrook then and there well knew, contained poison, and which then and there consisted of about two pounds of pancake flour and about one ounce of poison, to wit, arsenic, mixed together, which said article and composition, as he the said Alvah W. Estabrook then and there well knew, might hurt, harm, injure and kill any person partaking of the same as food, that is to say, a parcel post package containing said article and composition which he the said Alvah W. Estabrook then lately before, to wit, on May 16, 1926, deposited for mailing in the post office of the United States at Denver, Colorado, and which, at the time of such depositing bore United States postage stamps sufficient for postage thereon and was directed, on its outside wrapper, to said Edward E. Porterfield by the name of E. E. Porterfield, at Kansas City aforesaid, in said Western Division of said Western District of Missouri, and which thereupon, in pursuance of such depositing and according to the intention of said Alvah W. Estabrook was transmitted in due course by mail of the United States from Denver aforesaid to Kansas City aforesaid, and there delivered by said mail to said Edward E. Porterfield, to wit, on the day and year first aforesaid," etc.

The charge was based on section 217, Cr. Code, now section 340, tit. 18, USCA. The section, after declaring that all kinds of poison and all articles and compositions containing poison shall be nonmailable, reads:

"Whoever shall knowingly deposit or cause to be deposited for mailing or delivery, or shall knowingly cause to be delivered by mail according to the direction thereon * * * anything declared by this section to be nonmailable * * * with the design, intent, or purpose to kill or in anywise hurt, harm, or injure another, * * *

Alvah W. Estabrook, in pro. per.

S. M. Carmean, Asst. U. S. Atty., of Kansas City, Mo. (Roscoe C. Patterson, U. S. Atty., of Kansas City, Mo., on the brief), for the United States.

Before WALTER H. SANBORN and LEWIS, Circuit Judges, and PHILLIPS, District Judge.

shall be fined not more than ten thousand dollars or imprisoned not more than twenty years, or both."

This defines an offense against the postal service and, under the statute the prosecution may be in the district where defendant causes delivery to be made. The crime is committed there. Salinger v. Loisel, 265 U. S. 224, 44 S. Ct. 519, 68 L. Ed. 989.

■ Many errors are assigned. We think it requires no argument to show that the court did not err, as claimed, in overruling the demurrer to the indictment. The charge embodies all elements of the crime as it is defined by the statute, and in addition thereto, sets out such facts as to specify the particular offense. It protects defendant against another prosecution for the same crime, and also enabled him to prepare his defense.

E. E. Porterfield was one of the judges of the state trial court at Kansas City. He received the package of pancake flour containing the arsenic at his home in Kansas City, and from it pancakes were made for the family for breakfast a day or so later. He and other members of his family who ate them became quite ill, and on calling a physician it was discovered that they were suffering from arsenic poisoning. Later an analysis of the contents of the package disclosed the arsenic mixed with the flour. The defendant maintained at Kansas City for several years a laboratory for analyzing cereals which he conducted as a cereal chemist. He had a wife, a son and an adopted daughter. Discord arose between him and his wife and he became embittered toward his father-in-law, Mr. Slater. Estabrook, his wife and his father-in-law went to Judge Porterfield's court to discuss with him their family differences, and perhaps for advice. Estabrook claimed that Judge Porterfield was very unfair to him on that occasion and he thereafter became very hostile toward the Judge. He wrote the Judge one or more abusive letters, and later, after he came to Denver he expressed in letters to his wife and to a bank in Kansas City his extreme animosity toward the Judge. He came to Denver in October, 1924, and brought with him his young son. His sister resided in Denver and he and the boy lived with the sister for several months after he came to Denver. Insanity was one of his defenses, and the testimony of his sister, as well as that of other witnesses who resided in Kansas City, clearly shows that at times, at least, he had an obsession that Judge Porterfield intended to do him great wrong. His sister testified that he told her he heard Judge

Porterfield was coming out to Denver and he proposed that he would kill the Judge, arguing to her that his action would be justified. Some months after he came to Denver he acquired a small drug store and was carrying on that business at the time of his arrest, in May, 1926. He and his son occupied the rear of the store for sleeping quarters.

■ A complaint charging him with the offense was filed with a United States Commissioner at Kansas City and a warrant of arrest issued. A post office inspector came to Denver with the warrant and a copy of the complaint. Arriving in Denver he went to the chief of police and explained his mission. Thereupon a city police officer was assigned to go with Mr. Donaldson, the inspector, to the drug store and arrest Estabrook. After the arrest Donaldson and a city detective of Kansas City who came to Denver with Donaldson returned to Kansas City, taking Estabrook with them. No extradition warrant was obtained in Denver. This is now urged as error. It is argued that his removal was unlawful, that the United States District Court for the District of Colorado had exclusive jurisdiction over the defendant on his arrest and that he could not be lawfully taken elsewhere and put to trial without the consent of said court. But this question is first raised here, it was not presented to the trial court nor passed on by that court, and we have no doubt that court had jurisdiction both of the offense and of the person of the defendant. Furthermore, the witness Donaldson testified that "defendant waived requisition to come back to Kansas City"; and there is no contradiction of this statement.

The address on the package of pancake flour containing arsenic was this:

"Free sample
"Govt. 1 E. F. M.
"E. E. Porterfield, 5425 Westover Road,
"Kansas City, Mo."

■ It was sent by parcel post and bore the requisite postage stamps and the stamps were canceled with the Denver postmark. The address was made with a typewriter. When defendant was arrested at his drug store in Denver the officers found there and took away with them an empty bottle which had contained one ounce of arsenic, one Oliver typewriter, one package addressed to "C. L. Slater, Kansas City, Mo., 1215 Indiana Ave." (defendant's father-in-law), and one package containing arsenic acid poison. These were all introduced in evidence after the court had overruled defendant's motion

alleging that they were unlawfully seized and should be returned. This action of the court and its refusal to exclude them as exhibits at the trial is also assigned as error. We think they were competent as evidential circumstances in support of the charge. A typewriter of the same kind was used and its lettering submitted to the jury for comparison with that of the address on the package. The record does not disclose the contents of the package addressed to C. L. Slater found at the defendant's drug store. The defendant was hostile toward his father-in-law also. Instrumentalities for the commission of the crime charged and evidences which may tend to prove it may under the familiar rule be seized and held by the officers making arrest, whether found at the defendant's place of residence, or business or on his person.

■ It is also argued that the court erred in denying defendant's motion to direct a verdict of not guilty. The case was in part one of circumstantial proof. There was no direct evidence that defendant sent the package addressed to Judge Porterfield or caused it to be sent; nor was there any direct evidence to the contrary. The defendant testified in his own behalf and when asked the direct question whether he sent this package to Judge Porterfield he answered: "I don't remember anything about mailing a package to Judge Porterfield at any time." His son, who slept at the drug store in Denver with his father and who was about twelve years old at the time of the trial, was called as a witness for defendant. He testified, doubtless in support of the plea of insanity, that his father would go around mumbling to himself, saying he was going to kill Judge Porterfield and would "cuss" Judge Porterfield. Assuming the defendant's sanity, as the jury found, the intent and motive of the defendant in sending such a package clearly appear from the proof; and we think the circumstances were sufficient on which to submit to the jury the question whether defendant sent it or caused it to be delivered in Kansas City, as charged. On the issue of insanity the court instructed the jury in the terms requested by counsel for defendant. It submitted to them for their determination the question whether defendant was mentally incompetent to distinguish between right and wrong or to understand the nature of the act with which he was charged at the time he was alleged to have committed it. This seems to be in accordance with the rule laid down in Davis v. United States, 160 U. S. 469, 16 S. Ct. 353, 40 L. Ed. 499. The jury by its verdict found the defendant was sane at that time. A large part of the court's instructions and its review of the evidence was directed to this issue.

■ Complaint is made of the court's instruction on circumstantial evidence. On this point the court did not use the well known form of instruction, that before a conviction can be had on circumstantial proof alone the circumstances must exclude every reasonable hypothesis except that of the defendant's guilt. The court said:

"Whether the defendant did or did not cause this package to be delivered by mail was circumstantial. Circumstantial evidence is competent evidence if it convinces you beyond a reasonable doubt of the guilt of the defendant. It is sufficient. But if the circumstances in evidence are just as consistent with innocence as guilt, then it is your duty to find the defendant not guilty."

The last sentence announced a correct rule as to all kinds of proof in a criminal case, whether it be direct, circumstantial or both. The rule where proof is wholly circumstantial was not stated. Isbell v. United States (C. C. A.) 227 F. 788; Edwards v. United States (C. C. A.) 7 F.(2d) 357; Partson v. United States (C. C. A.) 20 F.(2d) 127; Dimmick v. United States (C. C. A.) 135 F. 257. But that rule had no application to the proof on the issue of intent and sanity. It was not a case of circumstantial proof only. It would have been appropriate on the particular point to have given the jury the rule on circumstantial evidence, but it was not requested, nor its omission specifically called to the court's attention. We think its omission was not prejudicial error. Robinson v. United States (C. C. A.) 172 F. 105.

■ It is also argued that it was error to permit Mrs. Estabrook to testify as a witness for the prosecution. But the uncontradicted evidence shows that she had theretofore obtained a divorce from her husband and she was not permitted to testify to anything that occurred prior to the time she obtained the divorce.

■ There was testimony as to the previous good reputation of the defendant, that he was a law-abiding citizen; and an instruction of the court on that subject is assigned as error. In substance it was to the effect that the jury should acquit the defendant if, after considering all of the testimony, including that bearing on the defendant's good reputation, they had a reasonable doubt of his guilt. There was no exception to this part of the charge. In Edgington v. United

States, 164 U. S. 361, 17 S. Ct. 72, 41 L. Ed. 467, it is said:

"The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although without it the other evidence would be convincing."

This circuit has repeatedly held that a defendant's good reputation may alone engender in the minds of the jurors such a reasonable doubt as to entitle him to an acquittal. Sunderland v. United States (C. C. A.) 19 F.(2d) 202. Of course, it may also create a doubt when considered in connection with the other evidence in the case, as the court charged. Of this we may say as we said of the instruction on circumstantial evidence, no request was made that the court additionally charge the jury that good reputation alone might raise a reasonable doubt. Indeed, no exception or reference of any kind was made by defendant's counsel to this instruction. █ Defendant's counsel excepted to that part of the court's charge "which defines the term 'reasonable doubt' as not correctly stating the law." Several times throughout the charge the court admonished the jury that they could not convict unless they believed from the evidence beyond a reasonable doubt that he had committed the offense charged against him. The definition which the court gave was this: Reasonable doubt does not mean a mere possibility of innocence. It means a doubt which is reasonable. It must be a reasonable doubt before on that ground you can find the defendant not guilty. Many definitions of the term have been approved. They all seem to embody the substance of the form used in Hopt v. Utah, 120 U. S. 430, 7 S. Ct. 614, 30 L. Ed. 708. See also Wilson v. United States, 232 U. S. 563, 570, 34 S. Ct. 347, 58 L. Ed. 728; Agnew v. United States, 165 U. S. 36, 51, 17 S. Ct. 235, 41 L. Ed. 624; Dunbar v. United States, 156 U. S. 185, 196, 15 S. Ct. 325, 39 L. Ed. 390. Of the cases cited, the definition in the Dunbar Case is perhaps the most carelessly framed. We held in Nanfito v. United States (C. C. A.) 20 F.(2d) 376, that where a defendant requests a correct definition of the term it is error to refuse it. And in Pettine v. Territory (C. C. A.) 201 F. 489, we said on this subject, after referring to the Hopt and other cases: "In the trial of an important case it is unwise to depart from established and approved definitions to doubtful declarations and novel theories."

The court in the instant case did not wholly fail to define the term, but its definition was not a full and complete one, it was nega-

tive. A correct and full instruction on the subject was not presented to the court or requested, nor did counsel in his exception indicate to the court in what respect the court had erred in the instruction as given. We have spoken of the manner in which counsel took his exceptions, because we are convinced from the record he was fully competent to defend against the charge and protect against error in the progress of the trial. And so we cannot but feel there was an unfairness to the court in not pointing out the objections now urged, and there would be a miscarriage of justice if they were now sustained. We must believe the points now relied on, of seeming merit, would not have appeared in the record if attention had been called to them at the time.

Other claimed errors are insisted on. We have considered them and are convinced they are without merit.

The late Judge SANBORN presided at the argument of this case, at our conference, and concurred in the conclusion which we announce.

The judgment is affirmed.