BERENBEIM v. UNITED STATES.

SCHECHTER v. SAME.

MANKOFF v. SAME.

Nos. 3481–3483.

Circuit Court of Appeals, Tenth Circuit. Nov. 5, 1947.

Rehearing Denied Dec. 10, 1947.
Writ of Certiorari Denied Feb. 2, 1948.
See 68 S.Ct. 454.

Philip Hornbein, of Denver, Colo. (Louis E. Gelt, of Denver, Colo., on the brief), for appellants Samuel Leonard Berenbeim and Ben Schechter.

Jean S. Breitenstein, of Denver, Colo. (James B. Radetsky, of Denver, Colo., on the brief), for appellant Harold Isadore Mankoff.

C. V. Marmaduke, Asst. U. S. Atty., of Denver, Colo. (Ivor O. Wingren, U. S. Atty., of Denver, Colo., on the brief), for appellee.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

Article IV of the Soldiers'. and Sailors' Civil Relief Act, as amended, 54 Stat. 1183, 56 Stat. 773, 50 U.S.C.A.Appendix, § 540 et seq., concerns itself with keeping in force and effect insurance covering the lives of persons while in the armed service of the nation. Section 400 of the Article in presently material part provides that the term "policy" as used therein shall include any contract of life insurance, including any benefit in the nature of life insurance arising out of membership in any fraternal or beneficial association, which does not provide for the payment of less than the face value thereof or for the payment of an additional sum as premiums if the insured engages in the military service of the United States, which is in force on a premium paying basis at the time of the making of application for benefits under the Act, and which was made and a premium paid thereon not less than 30 days before the date on which the insured entered the military service. Section 401 authorizes the making of applications to the Administrator of Veterans' Affairs for benefits under the Article. It provides that the application shall be in duplicate; that one copy shall be sent to the insurance company; and that the other copy shall be sent to the Administrator. Section 403 pro-

vides that a policy found by the Administrator to be entitled to protection under the Article shall not subsequent to the date of the application for benefits and during the period of military service of the insured or during two years after the expiration of his service, lapse or otherwise terminate or be forfeited for nonpayment of premium becoming due and payable. And section 406 provides that the amount paid by the United States to an insurance company on account of applications approved under the provisions of the Article shall become a debt due to the United States by the insured, and that such amount shall be collected either by deduction from any amount due to the insured by the United States, or otherwise as provided by law. Section 35 of the Criminal Code, as amended, 18 U.S.C.A. § 80, provides that it shall be a penal offense to make or cause to be made or present or caused to be presented, for payment or approval, to or by any person or officer of the United States, a false, fictitious, or fraudulent claim, knowing it to be false, fictitious, or fraudulent. In addition, it makes it a penal offense to falsify or conceal or cover up by trick, scheme, or device any material fact, or make or cause to be made any false or fraudulent statement, or representation, or make or use or cause to be made or used any false account, claim, or certificate, for the purpose of obtaining or aiding to obtain the payment or approval of a false, fictitious, or fraudulent claim against the United States. And section 37 of the Criminal Code, 18 U.S.C.A. § 88, make it a crime for two or more persons to conspire to commit an offense against the laws of the United States, or to defraud the United States in any manner or for any purpose, attended by an overt act of one or more of the conspirators in furtherance of the purpose.

An indictment returned in the United States Court for Colorado charged Samuel Leonard Berenbeim, Harold Isadore Mankoff, Ben Schechter, and Marie Stoeffler with the forming of a conspiracy fraudulently to cause the United States, through the Veterans Administration, to guarantee the payment of premiums on life insurance certificates or policies issued by Ancient Order of United Workmen, hereinafter

called the company, covering the lives of persons who were about to enter or had entered upon active duty in the military service of the United States. The defendants were found guilty; and Berenbeim, Schechter, and Mankoff perfected separate appeals from the respective sentences imposed upon them.

Evidence was adduced at the trial which tended to establish these facts. The company was a fraternal benefit society organized under the laws of Kansas, with its principal place of business at Newton, Kansas. Its certificates or policies of insurance, issued only to persons who applied for membership in the company, did not contain a war exclusion provision. Berenbeim was its state agent in Colorado, and he received a commission of 82½ per cent of the first year's premium on all policies written in Colorado, 15 per cent on the premiums paid for the second year, and 7 per cent on the premiums for the third, fourth, fifth, and sixth years. His duty among other things was to select, employ, and train subagents in Colorado. Mankoff and Schechter were subagents under Berenbeim. Originally, Berenbeim was to pay each of them for his services 50 per cent of the first year's premium on all policies which he obtained. The amount was later increased to 70 per cent. Marie Stoeffler was employed by Schechter as his subagent, and her compensation was 40 per cent of the first year's premium on all policies which she obtained through her own efforts and 20 per cent when she solicited jointly with Schechter. Berenbeim furnished Mankoff and Schechter with blanks and information for their use in soliciting policies. Applications for insurance and reports of medical examiners were placed in the hands of Berenbeim. He transmitted them to the company; and when policies were issued, they were mailed to him and he in turn passed them to the subagent for delivery to the insured or the beneficiary. Applications for benefits under the Act, supra, also were placed in his hands and he transmitted them, one copy to the company and the other to the Veterans Administration. Mankoff, Schechter, and Marie Stoeffler conducted a campaign of solicitation among young men in the military service or about

to enter it. Sometimes the prospects were solicited singly and sometimes group meetings were held. In some instances money was paid to a selectee for his services in helping to solicit his friends and associates to take policies. The price usually paid was $5 for each application obtained in that manner. The prospects were told in substance that they could obtain a policy for $10,000 for which they would pay nothing, and for which they would owe nothing. They were told that the United States would guarantee the premiums. They were not told directly or indirectly that they would be liable to the United States for all sums which it paid in fulfillment of the guarantee. The defendants had each prospect willing to take a policy sign three printed blanks, one denominated obligation and application for membership and policy, one medical examiner's report, and one application for benefits under the Act. None of these was filled out at the time of being signed, and all of them were delivered to the agent soliciting the policy. In instances where the prospect was not yet in the military service he was given a card or form and an envelope addressed to the agent soliciting the policy with instructions to write on the card or blank after he had entered into active duty, his name, date of entry into the service, serial number, rank, and certain other information, and then to mail it to the agent soliciting the policy. On receiving the card or form furnishing the information, and at least in one instance without receiving it, the application for the policy was filled out over the signature of the applicant. In some instances, the report of the medical examination was filled out to show that the applicant for the insurance was examined by a named physician in Denver. But in many cases the applicant did not appear before the physician and no examination whatever was conducted. And in some of the cases, the applicant was not in Denver at the time referred to in the report. After being filled out in that manner, the application for the policy and the report of medical examination were forwarded to the company. For many years it had been the custom of the company to date its policies the first of the month regardless of the day within the month upon which the application was made for the policy. Due to that custom, some of the policies solicited and obtained by the defendants appeared on their face to have been issued more than 30 days prior to the time the insured entered active military service, while in fact they were issued less than 30 days prior to such entry into the service, and the insured did not pay any premium upon them. In many instances no policy was delivered to the insured or the beneficiary. After the policy had been issued the defendant who had solicited the insurance filled out or caused to be filled out the application for benefits under the Act previously signed in blank and left with such defendant. One question asked in the application was the due date of the last premium paid on the policy, and the date called for in that question was given as the first day of the month in which the policy was written. Another question was the date on which the next premium would be due and payable, and the date called for in that instance was given as the first day of the month following the month given in response to the previous question. Relying on these answers, the company gave like answers to like questions in the report which it submitted. Filled out in that manner, the application and the report in many instances without foundation of fact showed that the policy had been issued on a premium-paying basis and a premium paid thereon more than 30 days prior to the entry of the insured into active duty in the military service. Relying upon the statements made in the applications and in the reports submitted in that manner, the Veterans Administration approved many of the applications, the company accounted to Berenbeim for his commission, Berenbeim made payments to Mankoff and Schechter, and Schechter in turn settled with Marie Stoeffler.

 The purpose of section 35 of the Criminal Code is to protect the government, and its departments and agencies, from the perversions which might result from the deceptive practices therein described; and the purpose of section 37 is to protect the government from impositions through conspiracies to cheat and defraud in respect of its rights and privileges, as well as in

respect to its property. Section 37 is not limited to conspiracies in which the parties contemplate a financial loss, or in which a loss of that kind results. A scheme designed to interfere with or obstruct a department or an agency of the government in respect of one or more of its lawful functions by deceit, craft, chicanery, or trickery, attended by an overt act of one or more of the conspirators in furtherance of the purpose, comes within the statute, even though pecuniary or property loss to the government is not contemplated and does not result. Haas v. Henkel, 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569, 17 Ann.Cas. 1112; Hammerschmidt v. United States, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968; United States v. Gilliland, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598; Curley v. United States, 1 Cir., 130 F. 1, certiorari denied, 195 U.S. 628, 25 S.Ct. 787, 49 L.Ed. 351.

■ The conspiracy laid in the indictment in this case and established to the satisfaction of the jury consisted of related steps in an integrated operation. They were making false representations to induce men either in the military service or about to enter it to make applications for policies; sending or causing to be sent to the company applications obtained in that manner, accompanied by faked or fictitious reports of medical examination; sending or causing to be sent applications in duplicate for benefits under the Act, one copy to the company and one to the Veterans Administration; and causing the company to send reports to the Veterans Administration, all for the purpose of bringing about the guarantee of the premiums on the policies, the Veterans Administration basing its guarantee on the information contained in the applications and in the reports of the company. While the applications for policies and the reports of medical examination were sent to the company, not the Veterans Administration, every step in the pattern uniformly followed by the defendants was intended and designed to lay the foundation for the guarantee of the premiums on the policies. Merely bringing about the issuance and delivery of the policies was not the ultimate objective. The insured would not have the funds with which to pay the premiums while in military service. The guarantee of the Veterans Administration was essential to the defendants collecting their respective percentages of the premiums. All of the steps short of that were without any financial reward. The scheme apparently designed, patterned, and carried out with deliberate care involved from the very outset much more than merely dating policies back to the first day of the current month in which the applications were submitted and the paying of the first premium on them. It was saturated with falsity and concealment. The prospects were told in substance that they could obtain the insurance coverage without cost or liability. The obligation to reimburse the government for premiums paid was carefully concealed. The applications for insurance were held until the strategic time arrived and were then filled out. The reports of medical examination were faked. Certain material information given in the applications for benefits under the Act was misleading and deceptive. And as contemplated by the defendants, the reports of the insurance company contained statements or representations similar to the misleading and deceptive representations contained in the applications for benefits under the Act in respect of the time the insurance had been in effect and a premium thereon. All of that was done for the purpose of bringing about the guarantee of the premiums, after which the defendants would reap their financial reward. An agreement to enter into such a concert of action for that ultimate end attended by one or more overt acts by one or more of the parties constitutes a conspiracy to defraud the United States, in violation of section 37, supra.

■ It is contended that if the evidence was sufficient to establish a conspiracy to defraud the United States, it affirmatively established two separate and distinct conspiracies, with Berenbeim and Mankoff parties to one and Berenbeim and Schechter parties to the other; and that therefore a fatal variance existed between the charge and the proof. It is well settled that where the indictment charges a single conspiracy and the proof establishes two or more different and disconnected conspiracies, the variance is fatal and a conviction cannot be sustained. Kotteakos v.

United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557; Marcante v. United States, 10 Cir., 49 F.2d 156; Telman v. United States, 10 Cir., 67 F.2d 716, certiorari denied, 292 U.S. 650, 54 S.Ct. 860, 78 L.Ed. 1500; Oliver v. United States, 10 Cir., 121 F.2d 245, certiorari denied, 314 U.S. 666, 62 S.Ct. 124 86 L.Ed. 533. Here, Berenbeim was state agent for the insurance company in Colorado. He employed Mankoff and Schechter as his subagents, and Schechter employed Marie Stoeffler to assist him. Berenbeim maintained offices in Denver. Mankoff occupied space in those offices. Schechter maintained offices in the same building and on the same floor. Mankoff, Schechter, and Marie Stoeffler were working for the same company and were under the same management. They were in close proximity with each other, and they followed with precision identical methods and techniques almost to the point of minute details. They received their directions, and supplies at the same source, delivered their applications and reports of medical examination to the same source, received from the same source policies for delivery to the insured or the beneficiary, and received their compensation through the same channel. It is not essential that each member of a conspiracy know and come in direct contact with all other members in relation to the conspiracy. Neither is it required that each participate in or have knowledge of all of the operations of the conspiracy. It suffices if a conspiracy is formed and the several persons knowingly contribute their efforts in furthering it. Booth v. United States, 10 Cir., 57 F.2d 192; United States v. Manton, 2 Cir., 107 F.2d 834, 848, certiorari denied, 309 U. S. 664, 60 S.Ct. 590, 84 L.Ed. 1012. The evidence and the inferences reasonably to be drawn from it were sufficient to warrant the jury in reaching the conclusion that the several defendants were parties to a single conspiracy to defraud the United States, as charged in the indictment.

 It is urged that the court erred in refusing to give requested instruction 21. The substance of the instruction was that the defendants should be acquitted if the jury believed, or entertained a reasonable doubt with respect thereto, that they acted in good faith in the honest belief that they were doing that which they had a legal right to do, even though the effect of their action was illegal. At one place in its general instructions, the court specifically instructed the jury that intent was an essential element of the crime charged in the indictment; and that in order to convict the defendants, the jury must find that they conspired with an intent to defraud the United States. At another place, the court again specifically instructed the jury that intent was an essential element of the charge; and that before there could be a conviction, the jury must find from the evidence beyond a reasonable doubt that the defendant or defendants convicted had a corrupt intent and acted with full knowledge that the things being done were done for the purpose of defrauding the United States. And at a third juncture, the court further instructed the jury specifically that intent was an essential element of the offense charged; and that in order to return a verdict of guilty, the jury must find that the defendant or defendants convicted had the necessary intent to violate the law. The essence of the instructions was that bad faith—the antithesis of good faith— was an essential element of the offense charged in the indictment which must be proved; and that if the evidence failed to establish to the satisfaction of the jury beyond a reasonable doubt bad faith on the part of the defendants, they should be acquitted. Considered as a whole, the instructions relating to intent were simple, plain, and understandable, and they left no room for doubt or confusion. They made it clear that it was incumbent upon the government to prove beyond a reasonable doubt that the defendants conspired with bad faith, that is to say with intent to defraud the United States. It is inconceivable that the jury could have failed to understand that if the defendants acted in good faith they should go free. And it has been held many times that a court is not required to give a requested instruction even though it is a correct statement of the applicable law if the matter to which it refers has been fairly and adequately covered in the instructions given. Ayers v. Watson, 137 U. S. 584, 600, 11 S.Ct. 201, 34 L.Ed.803;

Coffin v. United States, 162 U. S. 664, 673, 16 S.Ct. 943, 40 L.Ed. 1109; Agnew v. United States, 165 U. S. 36, 51, 17 S.Ct. 235, 41 L.Ed. 624; Troutman v. United States, 10 Cir., 100 F.2d 628; Metropolitan Life Insurance Co. v. Banion, 10 Cir., 106 F.2d 561; Hancey v. United States, 10 Cir., 108 F.2d 835; Mid-Continent Pipe Line Co. v. Whiteley, 10 Cir., 116 F.2d 871; Oliver v. United States, supra.

At the conclusion of the giving of the general instructions of the court, the defendants excepted to the parts thereof relating to intent. The ground of the exception was the inadequacy of the instructions concerning that matter. Thereafter, the court gave certain additional instructions. Among other things, the court said "good faith and honest belief is a defense, if you so find after you have considered all the evidence." It is argued that the import and effect of the instruction was to shift to the defendants the burden of establishing affirmatively their good faith and honest belief. Stated otherwise, it is contended that the instruction cast upon the defendants the burden of establishing their innocence. But the instruction was not excepted to go on that ground. No objection or criticism of that kind was brought to the attention of the trial court, either in the form of an exception or otherwise. Therefore the question is not open to review. Federal Rules of Criminal Procedure, rule 30, 18 U.S.C.A. following section 687.

The judgments are severally affirmed.