## MORROW v. UNITED STATES.
### No. 6706.

Circuit Court of Appeals, Seventh Circuit.
Feb. 2, 1939.

Edward H. S. Martin and John B. King, both of Chicago, Ill., for appellant.

Keith L. Seegmiller, of Washington, D. C., Michael L. Igoe, U. S. Atty., of Chicago, Ill., and Julius C. Martin and Wilbur C. Pickett, Sp. Asst. to the Atty. Gen., both of Washington, D. C., for appellee.

EVANS, Circuit Judge.

All of the assigned errors will be considered together for they are somewhat related. The first deals with the alleged improper admission of evidence showing plaintiff had been paid by the Government as compensation for disabilities, amounts varying from $8 to $125 per month—a total of over $9,000. This evidence was received after plaintiff had opened the door, so defendant asserts, and had shown payments of $1,539 in August, 1930. Plaintiff argues that the evidence of payments of $75 to $125 per month for the years immediately succeeding 1930 prejudiced his case before the jury, who might have concluded one so liberally compensated should not also recover on a war risk insurance policy. His testimony, on the other hand, was perfectly proper, so he asserts, for it

Before EVANS, SPARKS, and TREANOR, Circuit Judges.

was limited to showing his policy had never lapsed, a necessary, material matter.

Defendant argues: Plaintiff opened the door for this evidence, and defendant entered and showed all such payments. Likewise, without objection, plaintiff, as part of his case, testified that he received $125 per month. Therefore, so argues the defendant, there was no prejudice. Finally, defendant contends that the evidence was admissible to show an absence of incentive to work. Cockrell v. United States, 8 Cir., 74 F.2d 151; Taylor v. United States, 5 Cir., 71 F.2d 76; Prevette v. United States, 4 Cir., 68 F.2d 112.

The second criticism related to the testimony of a witness who remained in the courtroom after an order removing all witnesses. She, a colored woman, was questioned about a boarding house she conducted, the particular question to which objection was sustained, was directed to plaintiff's, a white man, living at the boarding house with one presented as his wife—a colored girl who, it is inferred, passed under the name of the Patent Leather Kid. Plaintiff had previously stated that he was not married, and the Government asserted it asked this question to disprove plaintiff's previous statement. It is argued that prejudicial error necessitating a mistrial resulted from the asking of such a question.

The third objection goes to the improper appeals of defendant's counsel to the jury. In the course of an argument over the extent of plaintiff's physical defects, counsel said:

"Contrast here his condition in 1931 when he was living nine months in a nigger boarding house—and you got the significance of that: I know you could."

He also said:

"The man does not go near a hospital or a doctor for the next three years. Of course he was not working. He did not have to. By that time the government paid him in cash well over $2500 and the payments he has received from the government since 1930, to date are over $9,000. Today he is receiving $125 a month compensation. Of course, he did not work."

No objection was made to either statement.

We are satisfied that the case was fairly tried and the judgment was the correct one.

■ (a) It was within the discretion of the court to permit one who remains in the courtroom to testify, notwithstanding a previous order to exclude all witnesses therefrom. Holder v. United States, 150 U.S. 91, 14 S.Ct. 10, 37 L.Ed. 1010.

■ (b) The evidence of payment of large sums of money by the Government to the plaintiff was competent, and legitimate comment of counsel thereon was proper.

■ The extent of plaintiff's disabilities in July, 1927, was the vital issue of this law suit. Were they total and permanent?

The range of evidence which the inquiry invited was necessarily wide. The question related to a condition existing ten years before. To obtain a correct picture of plaintiff and his capacities at that time both parties were justified in adopting a liberal definition and application of materiality as applied to the evidence.

Plaintiff relied on the total absence of earnings covering a long period of time, to support his position. He told of his search for work without success for nigh onto sixteen years. He asserted that all jobs were refused or lost because of his physical disability. The facts by him recited were more or less persuasive. He offered other testimony—his own word as to the painful leg which had to be amputated in 1934. He told of the long list of hospitals he had attended, vainly seeking a remedy for this injured limb. Plaintiff thus tendered a fact issue which defendant had to meet and attempt to refute.

Its position was that plaintiff refrained from work because of disinclination rather than because of existence of physical disabilities. To prove this, the Government attempted to show something of plaintiff's general reaction to society's demands. His story carried a gripping interest as he told of living from hand to mouth and day to day, how he moved from city to city seeking shelter and assistance from the Red Cross, the Y. M. C. A., and the Salvation Army. His journeys included St. Louis, Kansas City, Omaha, Chicago, and places farther west. He told of his reenlisting in the army, of his desertion therefrom, of his arrest, and of his discharge. The background of the picture by him given is that of an alien who came to this country at an early age and remained grossly illiterate, unable to read, write, tell his age or the date of his birth. He had not attended school either in Italy or here in the United States.

It was with this background that the Government offered its testimony of disability payments to him. Its testimony showed or attempted to show how he acted when he received money from the Government, how and where he lived, and what he did or rather, did not do. He gave the information that he received payments from the Government ranging from $85 to $125. On its part the Government offered a table showing the aggregate of said payments. They exceeded $9,000. If prejudice arose from this fact, responsibility therefor must rest upon him for he it was who told that he had received and was receiving $125 a month.

Plaintiff could and probably did argue that such large payments by the Government were proof that the Government must have believed insured's disability was total. On the other hand, the Government might answer that the payments were nil until 1930 and grew larger and larger thereafter; that plaintiff's condition in 1927, not in 1936, was the proper subject of the jury's inquiry and further that plaintiff lived the same irresponsible life, working only occasionally, regardless of whether he enjoyed poverty or was burdened by a substantial monthly income from the Government.

■ Nor can we say that the plaintiff's marriage status was immaterial, although ordinarily it would be quite outside the field of legitimate judicial inquiry. It was not, of course, receivable to refute an immaterial fact. Its admissibility depended upon its materiality. Plaintiff's life and activities when he had a little money helped to show that under most favorable conditions his disinclination to work was (as it is with quite a few adult, healthy-bodied individuals) a sort of a mental complex. True, this testimony of how he lived under changing conditions was not as persuasive as the numerous reports of doctors who examined him many times between the date of his discharge and 1936, all of whom agreed, strange as this unanimity may appear, that he was not totally disabled. This testimony was more like the testimony of his subsequent marriage and that a son was born of this marriage. It was more like his story of reenlistment and of desertion and discharge, which doubtless carried with it some inferences which were capable of being used in the argument to the jury. Such testimony like an old photograph brought the past closer to the jury or rather transported the jury back into plaintiff's life in 1927, and thereby gave them a better understanding of the time, the place, and the subject of their inquiry.

■ No easy task is presented to create and apply a satisfactory, correct test or measuring stick whereby total and permanent disability may be mensurated. The task is made the more difficult because a different standard or yardstick is required in each case. As the mental horizon of the insured narrows, so does the yardstick shorten. Physical defects, however extensive, might not be called total with men of unusual mentalities, while a much better physical condition would spell total disability in one who could neither read nor write and whose reasoning powers were of the arrested mentality calibre. It follows that in a trial by jury wherein the total and physical disability of a discharged soldier whose mental equipment is decidedly limited is the vital issue, the court should give a wide latitude to the rule of materiality.

Then, too, it must be apparent that a jury of reasonable intelligence would not ordinarily be so prejudiced by the propounding of a question which was never answered as to render it unable to further dispassionately deliberate or would cause it to thereafter ignore the court's charge or other rulings.

■ There are cases where counsel persist in propounding improper questions and where it is clear that the questions are asked not to secure information but to prejudice and poison the jury's mind. In such cases a court may justifiably order a mistrial.

■ In the case before us the court ruled with the plaintiff on his objection to the question propounded. The answer to the objectionable question was never given. Moreover, if the remarks of counsel to the jury evoked prejudice, plaintiff did not object. The final charge of the court to the jury does not appear in the record. Plaintiff omitted it from the bill of exceptions. Doubtless, its absence may be explained on the assumption that the instruction was fair and entirely acceptable to plaintiff. Did the instructions refer to this matter? We are not advised. In view of the ruling by the court when the question was asked, it is fair to assume that the court would have given instructions consistent with the ruling, had it been requested so to do.

■ There is another and most conclusive reason for refusing plaintiff's motion for a new trial because of this assignment of error. To grant the motion would in effect permit the plaintiff to gamble on the effect of defendant's counsel's conduct on the jury.

While counsel should refrain from embarrassing the court or possibly prejudicing the jury, opposing counsel also has a duty. If he believes that a prejudice exists, due to an improper question or remark which will prevent a fair trial, the party who is prejudiced should ask for a new trial then and there. It is neither fair nor just that he first take a chance on a favorable verdict and, if disappointed, then complain. See Southern Ry. Co. v. Rogers, 6 Cir., 196 F. 286; In re A. O. Brown & Co., D.C., 189 F. 432; Allen v. U. S., 7 Cir., 4 F.2d 688; Wolf v. U. S., 7 Cir., 283 F. 885; Tinkoff v. U. S., 7 Cir., 86 F.2d 868, on rehearing; Note 96 A.L.R. 530.

The judgment is affirmed.