**UNITED STATES v. CHIARELLA et al.**

No. 48, Docket 21741.

United States Court of Appeals
Second Circuit.

Argued Oct. 3, 1950.

Decided Oct. 30, 1950.

Abraham V. Kaplan, New York City, for Chiarella.

Mordecai M. Merker, New York City, for Stancin. David J. Paully, New York City, for Pietraniello. Myles J. Lane, New York City, for appellee.

Before L. HAND, Chief Judge, and SWAN and CLARK, Circuit Judges.

L. HAND, Chief Judge.

■ These are appeals from a conviction for counterfeiting; there were four counts in a single indictment; receiving, possessing, selling or trying to sell, and in conclusion the inevitable conspiracy count. One of the four original appellants, Palmisano, has consented to the dismissal of his appeal, so that there are left only three: Chiarella, Stancin and Pietraniello. The questions raised turn for the most part upon supposed errors in the course of the trial, although Pietraniello and Stancin argue that there was not enough evidence to support a verdict against them. In any event it is necessary for an understanding of the alleged errors to state the facts as the jury might have found them from the testimony, which came principally from the mouths of Pandolfo, a confederate who testified for the prosecution, of Seidler, an informer, and Gopadze and Carli, secret service agents. In December, 1949, Pandolfo in Los Angeles suggested to Seidler that he knew where counterfeit money could be got, and Seidler passed on this information to secret service agents of the Treasury, who told him to go on with the negotiation. He thereupon had a number of telephone talks with Pandolfo who said that he was having trouble getting the money, but who finally on January 9th of this year made contact with the appellant, Stancin, who told him that he knew one, Chiarella, in New York who might be willing and able to sell counterfeit money. On the same day Stancin and Pandolfo telephoned to Chiarella in New York who gave them some encouragement, and on the next day they both went to Seidler's apartment where were not only Seidler himself, but the two agents, Gopadze and Carli, representing themselves to be confederates. Several of them talked with Chiarella on the telephone, telling him they wanted $300,000 in ten and twenty dollar bills, to which Chiarella answered that he would send on samples, as he soon did. When these arrived, Seidler, Stancin and

the two agents (Pandolfo had been meanwhile arrested on another charge), found them satisfactory and Seidler and Gopadze set out to New York, where on the 24th Chiarella came to visit them at their hotel in Manhattan. On the 25th they arranged for delivery of the bills at the hotel for $60,000; but, at the time and place agreed, Chiarella, fearing a trap, had Palmisano make a sham delivery. However, his suspicions were soon allayed and he agreed to make a true delivery at his apartment in Queens County, New York, whither all four then went in Palmisano's car. At five o'clock on that afternoon Pietraniello came with $200,000 in bills in two bags, which were opened and the money counted. Pietraniello and Seidler stayed in the apartment, guarding the counterfeits, while Chiarella, Palmisano and Gopadze went back to New York to get the $60,000. While they were gone Pietraniello told Seidler that the remaining $100,000 would be delivered at the time of the payment. We may pause at the outset to dispose of the argument that that was not enough evidence to support a verdict against Pietraniello. True, he swore that he did not know what the bags contained, but his remaining with Seidler to guard their contents after the bags had been opened and his talk with Seidler just mentioned, were ample proof of his guilty knowledge, and his implication in the venture, if the jury chose to believe the testimony. It is not necessary to discuss the evidence against Stancin. There remain for our consideration therefore only the objections taken during the course of the trial.

### Chiarella

■ Chiarella's first complaint is that, although the judge kept the prosecution's witnesses out of the courtroom while they were not testifying, he refused to tell them not to discuss the testimony with one another. So far as we can find, this question has never arisen, and it is universally held that even the exclusion from the courtroom of witnesses who have not testified is dis-

cretionary.[1] *A fortiori* an instruction to them not to discuss the evidence while out of the courtroom is also discretionary.

■ Next is the objection to the judge's refusal to let the jurors take notes of the evidence during the trial. The notion has at times been countenanced that jurors should not be allowed to take notes, on the theory that they take on an undue importance when the jury deliberates. That question was raised in Agnew v. United States,[2] though not decided; but in United States v. Davis,[3] the practice was condemned, while in Chicago and Northwestern Railway v. Kelly,[4] and in United States v. Carlisi,[5] it was apparently approved. The supposed dangers appear to us far-fetched, if not imaginary; but even if we are wrong, it has never been suggested that the judge must *permit* the practice; the question has always been whether he must *forbid* it. Moreover, it is at most a matter of discretion.

■ The next objection is to a comment of the judge critical of Palmisano's conduct in the courtroom. Although it was agreed at the outset of the trial that the objection of one of the accused should stand for all, it is inconceivable that the judge's stricture should have done harm to anyone but Palmisano; and, as we have said, his appeal has been dismissed.

■ The next objection arose in the following way. Carli, the Treasury agent, was testifying to the telephone negotiations between Chiarella in New York and Stancin, Pandolfo, Gopadze and Seidler, in Los Angeles, for the purchase of the bills. After the talk was over, Stancin in order to assure the others that he was well acquainted with Chiarella and that they might therefore rely upon him, told them that Chiarella and he had "served a term in jail together." The statement was part of the very negotiations which resulted in the sale, uttered to persuade those present that they might safely deal with Chiarella; and was admissible as such. The fact that incidentally it disclosed another crime did not make it any the less so.

We pass the three following objections because they are too trivial to deserve more than a bare mention. The first is a supposedly prejudicial comment of the judge to one of the accused's counsel while cross-examining Carli. The second is some testimony of Carli, brought out by the judge's questioning. The third is an innocent remark of the district attorney that there had been some attempt to confuse Carli.

■ Next are two objections to the examination of Pandolfo's attorney who had represented him in California upon prosecution for another crime. The testimony was relevant. Pandolfo, like all others who turn against their former confederates, was under the suspicion of trying to save himself by making a case against them. It was proper to bring out what inducements the prosecution had offered him and that was the subject of the attorney's testimony. The particular objections are unimportant, once the general relevancy of the testimony is decided.

■ The next objection is to a part of the redirect examination of Pandolfo. On his cross-examination the defence brought out that Pandolfo had heard from Stancin of a ring owned by a woman in California which it would be easy to steal, and that he had broached the project to Seidler. The objection is that the prosecution was then allowed to ask particulars of Pandolfo's talk with Stancin. On what theory an accused may complain that details of an occurrence were developed on redirect which he brought into the case on cross, we are not advised.

1. Hood v. United States, 8 Cir., 23 F.2d 472, 475; Tinkoff v. United States, 7 Cir., 86 F.2d 868, 879; Morrow v. United States, 7 Cir., 101 F.2d 654, 656; Twachtman v. Connelly, 6 Cir., 106 F.2d 501, 507; Oliver v. United States, 10 Cir., 121 F.2d 245, 250; Mitchell v. United States, 10 Cir., 126 F.2d 550, 553; Kaufman v. United States, 6 Cir., 163 F.2d 404, 408; United States v. Five Cases, 2 Cir., 179 F.2d 519, 522.

2. 165 U.S. 36, 17 S.Ct. 235, 41 L.Ed. 624.

3. C.C., 103 Fed. 457, 470, affirmed, 6 Cir., 107 Fed. 753.

4. 8 Cir., 84 F.2d 569, 576.

5. D.C., 32 F.Supp. 479, 483.

■ The next objection is more plausible. Seidler was telling of the talk in the New York hotel when Chiarella met him and the others who had come on from Los Angeles. The consequence of that talk was, as we have said, that the bills were later delivered at Chiarella's apartment in Queens County and not in the hotel; but Seidler testified that there had been some talk in the hotel "about dope" between Chiarella, Gopadze and Palmisano. To this the defence objected unsuccessfully, and Seidler was allowed to go into details. The talk was irrelevant and its admission erroneous; the excuse that it was part of the "res gestae" serves to show the damage which reliance upon that absurd term brings into any thinking which it invades. Nevertheless, we do not think that the error demands a reversal. Seidler's testimony was that Gopadze told Palmisano that he would "bring some opium" for sale and Palmisano that he would like to be "the exclusive buyer, the only buyer of the heroin," (sic). Chiarella's only part in the talk was that he corrected the price of heroin to $9,000 a kilo, which Palmisano had given Gopadze as $6,000 a kilo. That did of course indicate that Chiarella was familiar with this illicit trade, although it did not indicate that he proposed to take part in Gopadze's proposal. However, it appears to us substantially incredible that this could have turned the scale against him. We should have to suppose that, although the jury might have doubted the testimony of those witnesses who fixed the sale of the bills upon Chiarella, their doubts were allayed because one of these witnesses added that Chiarella showed an acquaintance with the peddling of narcotics. Unless trials are to become mere exercises in logical perfection, such a lapse ought to be disregarded.

■ Last is an objection to the judge's remark that Seidler was "apparently telling the truth." It is enough to observe that this did not overstep the power universally accorded to a judge to express his opinion on the facts, provided he makes it plain to the jury that they need not agree with him, which in the case at bar the judge did very explicitly in his charge.

■ So much for Chiarella's "Point I"; his "Point II" is an objection that the prosecutor in his address to the jury read as testimony from a paper which he held in his hand. That paper was a stenographic record of the actual testimony; and no more need be said.

■ Point III is that the appellants were entrapped into the commission of the crime within the doctrine of Sorrells v. United States.[6] Although that was the first decision of the Supreme Court in which entrapment resulted in a reversal, there had been earlier decisions in Courts of Appeal—the first, so far as we have found, being Woo Wai v. United States[7]—and the doctrine had been recognized much earlier.[8] It is true that the law is not as definite as one might wish as to what provocation constitutes an "entrapment," but we tried to state the upshot of it in United States v. Becker,[9] and we revert to that now. We said then, 62 F.2d at page 1008, that it was not a defence if the accused was already engaged (1) in "an existing course of similar criminal conduct"; (2) had "already formed a design to commit the crime or similar crimes"; or (3) was willing to do so "as evinced by ready complaisance". In the case at bar, although no "existing course of similar criminal conduct" was shown, it was not Seidler who opened the subject to Pandolfo, but Pandolfo to Seidler, when Pandolfo approached him with the information that he knew where counterfeit money could be got. Seidler did not indeed reject this proposal, for he at once disclosed it to the authorities, who told him to proceed; but certainly Pandolfo was not "entrapped." Next as to Stancin. According to Pandolfo, Stancin was in the room when Pandolfo told Seidler on the telephone that he had been unable to get the bills which he had hoped for; on overhearing which Stancin asked Pandolfo what "had happened," and

6. 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413.

7. 9 Cir., 223 F. 412.

8. Grimm v. United States, 156 U.S. 604, 15 S.Ct. 470, 39 L.Ed. 550.

9. 2 Cir., 62 F.2d 1007.

when Pandolfo answered that he "had made a fool" of himself because he had been "unable to deliver" the "notes" which he had promised, Stancin volunteered the answer that he knew "someone in New York * * who might get results." Again this was not an "entrapment" of Stancin. Next as to Chiarella. When Pandolfo broached the proposal to him on the 9th he asked for time to see whether there were any counterfeits available, and he told Pandolfo to call the next day when he accepted the suggestion and followed it by sending on the samples. If this did not show an existing "design" to commit "similar crimes" to that charged, certainly it "evinced" the most "ready compliance" conceivable. It is absurd to dress it as a provocation of an innocent person to embark in a crime to which he was not already independently predisposed. Last as to Pietraniello. True, it does not appear from whom he got the bags, and, as we have said, he said that he was innocent as to their contents. However, there is not the faintest intimation that he was inveigled into the venture by the prosecution.

## Stancin

We have already considered all the objections which affect the general conduct of the trial and of which, under the arrangement made at the opening, Stancin was also entitled to take advantage. We shall, therefore, consider only those which he raised independently. The most important is the charge of the judge declaring what were the facts which the jury must find in order to bring in a verdict against him. He told them that they might do so, if the "crime or crimes charged * * * resulted from his" "words and actions"; a person would be a principal, if "he causes an act to be done which if directly performed by him would be an offense"; and he concluded by quoting to them the whole of § 2 of the Criminal Code [10] in ipsissimis verbis. To this Stancin excepted. Before the amendment of § 2 in 1948, the last and an authoritative expression as to what constituted criminal liability was that "in order to aid or abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.'" [11] To do that involves much more than merely "causing an act to be done," as we pointed out at length in United States v. Falcone.[12] Unless we beg the question by importing into the word, "cause," the limitations of "abet," "aid" or "procure," "causing an act to be done" covers any acts which are necessary steps in the events that result in the crime; and that is equally true pro tanto, though we limit the steps to those which the actor knows to be likely so to result; for, even with that limitation there are many situations in which one may "cause" the crime, and yet not "abet," "aid" or "procure" its commission.

Until the second sentence was added to § 2 in 1948, the first sentence had been always substantially the same; and the Reviser's note on the second sentence says that it was "added to permit the deletion from many sections throughout the revision of such phrases as 'causes or procures'"; and that, "as revised," the section means to punish, not only one who abets another, but anyone "who causes the doing of an act", which would be a crime if he did it himself. Therefore, the note continues, "It removes all doubt that one who puts in motion or assists in the illegal enterprise but causes the commission of an indispensible element of the offense by an innocent agent or instrumentality, is guilty as a principal even though he intentionally refrained from the direct act constituting the completed offense." Even without the note we should have found it very hard to believe that the second sentence really intended so drastically to enlarge criminal liability, though it must be conceded that it is difficult to see what it meant, if it did not mean just that. Moreover, the note does not help very much

10. § 2, Title 18 U.S.C.A.

11. Nye & Niessen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L. Ed. 919; International Brotherhood v. N. L. R. B., 2 Cir., 181 F.2d 34, 38, 39.

12. 2 Cir., 109 F.2d 579, 587; affirmed 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128.

to clear up the confusion, except in so far as it may appear in general not to contemplate more than a restatement of already existing law. Yet in spite of the cogency of the verbal argument that can be made to the contrary, we cannot bring ourselves to be sure that such baffling language was intended to have so revolutionary a consequence. At any rate we shall assume for argument that the judge's charge which we quoted above was erroneous.

It does not, however, follow that judgment must be reversed as to Stancin; and in fact we think that the error, if it was an error, could not have prejudiced him. It is true that the prosecution did not prove that he had any other connection with the possession, receipt or sale of the bills than through his telephone calls to Chiarella on the 9th and the 10th; and it is also true that his own testimony was that on the first call he asked Chiarella only about the sale of jewelry, and that on the second he merely greeted him. Moreover, Chiarella bore out this version of the calls. However, it seems to us incredible that, if the jury believed this version of the calls, they could have found that Stancin "caused" the bills to be received, possessed or sold. If the error damaged Stancin, it was because the jury believed that his telephone calls to Chiarella, though they were not about counterfeiting, served as an introduction of Pandolfo and the others in their negotiation. Perhaps they might have thought that that innocent introduction became in fact a necessary step in what followed; but it passes belief that they should have thought it a step consciously taken to "cause" the crime, or that they should have found Stancin guilty, if the calls were no more than he said.

Stancin next complains that the jury was allowed to make an inference from the fact that at his arrest and afterwards he refused to be interrogated. Whatever prejudice he may have suffered from the judge's original ruling was completely cured by the charge in which he told the jury explicitly that "no inference of his guilt is to be drawn or found because he failed to make any statement as to his innocence. He can remain silent if he so desires."

He next complains because on cross-examination the prosecution was allowed to ask whether he had not been dishonorably discharged from the Army and had been sentenced to jail. Before the trial it was agreed that the prosecution should not bring out these facts—on the theory that they did not affect Stancin's credibility —unless "evidence is introduced that he was in the Army as a veteran." The question came up twice during the trial, first upon the examination of Stancin's mother; second, on his own. On the first occasion the prosecution first asked his mother whether her son had been in the Army to which she answered that he had been; and followed this by asking whether he had not been dishonorably discharged. It was certainly not the purpose of the agreement that the discharge and sentence were to be admissible, if it was the prosecution which brought out the evidence that Stancin had been in the Army. That would have been meaningless. The question as to the discharge was therefore a breach of the agreement, and merely as a question was presumably damaging. However, the second occasion was different. In cross-examination Stancin had volunteered the statement that he had been in the Army from 1941 to 1947; and the prosecution then put to him whether he had not received a dishonorable discharge. That was permissible under the agreement, and any harm done on the first occasion became inconsequential.

Finally, Stancin complains that a Californian witness, Burns, was not brought to New York to testify in his defence. It is enough to support the order of the second judge, who refused to have him brought on, that Burns had sworn to an affidavit which corroborated Pandolfo's testimony that Pandolfo and Stancin were talking together about counterfeit money, and that one of the two successfully tried to telephone to someone apparently on the same subject. True, Burns had confirmed Stancin's version of the talk in an earlier affidavit; but, if he had reverted to that affidavit upon the stand, his credibility would have been so far impaired by the second affidavit as to make his testimony useless to Stancin.

### Pietraniello

We have already considered the sufficiency of the evidence as to Pietraniello and there remain only three points to consider. The first is that the jury acquitted him upon the counts for selling and receiving the bills and for the conspiracy, and convicted him only for possessing. He complains of the inconsistency of this verdict; but it is too well settled to require argument that inconsistency between the verdict on one count and that on others is immaterial.[13] The second point is that the prosecution was allowed to ask him on cross-examination whether his wife's brother was not in prison in Atlanta. The judge sustained an objection to the question but only after it had been answered, so that whatever damage there was, was done before he ruled. The excuse offered by the prosecution was that it was proper to show what kind of people the accused "associates with," because he had called witnesses to prove his reputation for honesty. We know of no such doctrine, and no authorities are cited in its support; the question was improper and the prosecution should have known that it was. However, Pietraniello said that he was away in the Army at the time, and the nature of the brother-in-law's offence—in fact counterfeiting—did not appear. Lastly, Pietraniello complains that he was not permitted to call to the stand the attorney for the prosecution without disclosing how his testimony would be relevant. We do not suggest that an attorney who is trying a case can never be called as a witness, although the judge appears to have been of that opinion; but surely it should be a condition that the defense give some reason for such an unusual move.

This concludes all the objections raised which, as had appeared, do not call for a reversal of the convictions. We should affirm the judgment without more were it not for the cumulative sentences imposed upon Chiarella and Stancin. We have repeatedly protested against the practice when the counts are merely verbal variants of a single criminal transaction; but ordinarily we are powerless to interfere. In the case at bar it may turn out that we can, and we wish to give these two appellants an opportunity to present a point which they have not raised. Each was sentenced to imprisonment for a term of ten years on Count One, to a term of ten years upon Count Two, and to a term of five years upon Count Four; all these terms to be served consecutively, making twenty-five years in all. They were also sentenced to a term of ten years under Count Three, but, as that term was to be served concurrently with the Counts One and Two, it added nothing. Since Count One was for receiving the bills [14] and Count Two was for possessing [15] them, the question suggests itself whether the counts were for separate crimes and could be punished separately. The ordinary rule is that crimes are the same if the evidence, which suffices to prove one, is the same as that which proves the other.[16] Whether one can possess bills without receiving them (the bills not being made by the parties), or receive them without possessing them, would seem to be not free from doubt. The result of holding the judgment on either Count One or Count Two invalid would be to reduce the cumulated sentences to fifteen years, which is the maximum under § 472, and would avoid a cumulation of terms of punishment for the same transaction. If Chiarella and Stancin wish to do so, they may file and serve upon the prosecution a joint brief in support of this position within thirty days after this opinion is filed, the prosecution may answer within twenty days thereafter, and we will decide the question upon the briefs so submitted. Meanwhile, and subject to that condition, the convictions are affirmed.

Convictions affirmed.

---

13. Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356; United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48.

14. § 472, Title 18 U.S.C.A.

15. § 473, Title 18 U.S.C.A.

16. Morgan v. Devine, 237 U.S. 632, 35 S. Ct. 712, 59 L.Ed. 1153; United States v. Noveck, 273 U.S. 202, 47 S.Ct. 341, 71 L.Ed. 610; Oddo v. United States, 2 Cir., 171 F.2d 854; Woods v. United States, 8 Cir., 26 F.2d 63.

**912**

CLARK, Circuit Judge (concurring).

In concurring, I think it desirable to comment upon 18 U.S.C.A. § 2, for that involves a point of potentially wider significance than this case alone. As I read the opinion it would quite erase the new and added subd. (b) of that statute and would do so against a rather clearer statement of purpose in the Reviser's notes than is usual. My experience with these code revisions to date has convinced me that judges are confusing the problems involved immeasurably by trying to read the revisions as not making extensive changes when, as has become increasingly obvious, there are many substantial changes contemplated or made.

Here, particularly in the light of the evidence as to Stancin's connection with the crime in its early stages, I cannot believe that the judge committed any error in merely reading or repeating the words of the statute. I hardly imagine a trial judge will wish to take it upon himself to write a whole subdivision out of a statute; and, as an appellate judge, I do not want to do the same except where, after the fullest of consideration, it appears quite necessary. Such does not seem the case here. I should add that while I am not clear as to precisely what the objection is, I do not see anything in subd. (b), as explained by the Reviser, which would take away the need of a showing of the necessary criminal intent.