**Baudelia Carmona GONZALES et vir, Appellants,**

v.

**TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellee.**

**No. 11478.**

Court of Civil Appeals of Texas.

Austin.

June 28, 1967.

Rehearing Denied Sept. 20, 1967.

Second Motion for Rehearing Denied Oct. 11, 1967.

204

Warner A. Hancock, J. Hubert Lee, Austin, for appellants.

Clark, Thomas, Harris, Denius & Winters, John Coates, Mary Joe Carroll, Austin, for appellee.

O'QUINN, Justice.

Baudelia Carmona Gonzales in August of 1964 worked at the task of washing chickens for the L. East Produce firm. She suffered an injury at work, and sought and obtained an award from the Industrial Accident Board. Within the time allowed by law she brought her suit in district court.

This appeal is from judgment of district court setting aside the Board's award and allowing recovery of medical expenses in the amount of $696. The jury found in answer to special issues that Mrs. Gonzales' injury resulted in partial incapacity for 17 weeks and that during this period she had a weekly wage earning capacity of $50. It was stipulated that Mrs. Gonzales had not worked 210 days during the year prior to her injury but that another female employee of the same firm who had worked 212 days at the same work earned an average of $48.63 per week. Mrs. Gonzales alleged that her average weekly wage before and at the time of her injury was $58, or, in the alternative, an average weekly wage of $58 would be fair and just to her and to appellee if computation as required by law was not possible.

Under eleven assignments of error, appellant makes three main contentions. Appellant argues (1) that the jury finding that appellant had a weekly wage earning capacity of $50 during disability was not supported by the evidence; (2) that the finding of no total disability, and only partial disability for 17 weeks, was not supported by the evidence; and (3) that cross examination of the doctor who treated appellant, regarding his non-membership in the county medical society, coupled with references to the various other doctors who saw appellant, and argument of counsel to the jury regarding failure of one doctor to testify, caused the jury to return an improper verdict.

■ Appellant argues that she can not be partially disabled, as found by the jury, without suffering some reduction in her earning capacity. In making this argument, appellant stressed that there was no contention of an inconsistency between the jury finding of $50 per week earning "capacity" and the stipulation that the "actual" earnings of another worker doing the same job were $48.63 per week.

The Supreme Court held in 1961, in a case in which the parties stipulated the average weekly wage to be $86.80, that jury findings of (1) partial disability and (2) average weekly wage earning capacity

during disability of $86.80 were not fatal, "even when considered with the stipulation of the plaintiff's average weekly wages." Indemnity Insurance Company of North America v. Craik, 162 Tex. 260, 346 S.W.2d 830.

We find no substantial difference between the definition of "partial disability" submitted in the case before this Court and the definition construed by the Supreme Court in the Craik case, supra, 346 S. W.2d 830, 831, col. 2. In that case the Court observed that under this definition the jury could find that the claimant had suffered a partial disability without finding that he had suffered "a depreciation or deduction in his earning capacity." The Court distinguished this definition from the definition used in Employers Reinsurance Corporation v. Holland, 162 Tex. 394, 347 S.W.2d 605, 606, col. 1. In the Craik case, the Supreme Court observed that the definition of "partial disability" in that case was approved in Southern Underwriters v. Schoolcraft, 138 Tex. 323, 158 S.W.2d 991, 994, col. 1.

■ Appellant pleaded that her average weekly wage was $58. The stipulation of $48.83 as the average weekly wage was not a matter before the jury. The finding of the jury that appellant's average weekly earning capacity was $50 provided a figure less than the wage alleged by appellant. It is the general rule that a pleading that has not been abandoned, superseded or amended, will be regarded, for the purpose of use as such in a particular case, as a judicial admission, rather than just an ordinary admission. Hughes v. Fort Worth National Bank, Tex.Civ.App., Fort Worth, 164 S.W.2d 231 (writ ref.).

■ In this case the pleadings for the purpose of use in the suit, were abandoned, or substitution was made for the pleadings, when appellant entered into the stipulation of a weekly wage of $48.83. The pleadings of weekly earnings of $58 will not be binding on her, although by her failure to correct or change the pleadings to conform to the stipulation, the jury may have assumed she still claimed a weekly wage of $58. We are unable to see how a claim of weekly earnings in the amount of $58, however, can have any real relation to the jury's finding that Mrs. Gonzales had an average weekly wage earning capacity of $50. We believe this finding is not sufficiently supported by the evidence.

■ It was appellant's burden to prove that her average weekly wage earning capacity after the date of her injury was less than her weekly wage at the time she was injured. Employers Reinsurance Corp. v. Wagner, Tex.Civ.App., Galveston, 250 S.W.2d 420 (writ ref., n. r. e.).

Prior to employment at East Produce, appellant had worked in 1953 for an ice cream plant where she was paid $18 a week. For about three months, late in 1963 or early in 1954, she worked for a laundry where her weekly wage was $25. The record does not disclose any employment, by which an average weekly wage earning capacity might be gauged, except her work at the ice cream plant, the laundry, and at East Produce.

Mrs. Gonzales had been working for East Produce about three weeks when she was injured. At the time of her injury, Mrs. Gonzales was standing on an iron table, about three or four feet high, wearing a pair of rubber boots as she washed chickens passing in front of her on a conveyor wire. In her right hand she held a little pipe, connected with a water hose, by means of which she applied a stream of water to the chickens. The top of the table was wet and slippery. All of a sudden she slipped and almost fell down. She helped to maintain her balance by holding to the pipe. She told her boss, who was coming up, about the incident and said to him she was scared because she almost fell down. He asked whether she was hurt and she replied, "Well, I don't know."

Mrs. Gonzales finished the day at work, but early next morning she returned to the plant and told one of the workers she would not work that day because her back was hurting. On the recommendation of one worker, Mrs. Gonzales went to a chiropractor. On the same day, however, she went to a doctor who had previously attended her mother.

The doctor, Dr. Raul B. Mascarenhas, examined Mrs. Gonzales, found no fractures or dislocations of bones, and diagnosed her injury as "sprain of the muscles." The injury occurred August 18, and on August 24, the Monday following, she returned to work on the doctor's recommendation. Mrs. Gonzales worked about two and a half hours that day, but quit because of pain and went back to see Dr. Mascarenhas. Mrs. Gonzales received treatment from Dr. Mascarenhas from August, when she was hurt, until April 13 of the next year.

Dr. Mascarenhas testified that he declined to take Mrs. Gonzales' case after her injury until he called East Produce to determine whether she was covered by compensation insurance and to be sure he would be acceptable as her doctor. He gave as his reason, " * * * because I didn't want to do all this work and not get paid for it."

On the initial visit of Mrs. Gonzales, Dr. Mascarenhas made his diagnosis, took X-ray pictures, and applied "diathermy to shoulder." She returned the following day for "diathermy." During the month of August "diathermy" or "diathermy and ultrasound" were used in treatment on seven occasions, and on the last day of the month a "local procaine infiltration," a local anesthetic, was used for the first time, in addition to other treatment.

During the month of September Dr. Mascarenhas saw Mrs. Gonzales twenty times for treatment and on four occasions she had local anesthetic in addition to diathermy and ultrasound. In each of the months of October and November, Mrs. Gonzales was treated on thirteen days, and in December eleven days.

Altogether, Mrs. Gonzales received treatment eighty times. Sixty-four treatments were given between the date of her injury in August and December 30, which was the last date she received the "procaine infiltration." After January 1, 1965, until termination of treatments by Dr. Mascarenhas on April 13, Mrs. Gonzales had fifteen treatments, which were about a week apart.

It is observed that Dr. Mascarenhas gave Mrs. Gonzales seventeen "local procaine infiltrations" over a period of approximately seventeen weeks, which coincides numerically with the jury's finding of partial disability for seventeen weeks. The last such treatment was given December 30, at the end of a period of sixty-four visits to the doctor. For the next period of nearly three and one-half months there were fifteen visits to the doctor and no "procaine infiltration" to relieve pain. Mrs. Gonzales married about a month after she quit going to Dr. Mascarenhas.

In January, 1965, following her injury the previous August, appellant who was then Mrs. Carmona met Juan Gonzales, whom she married in May. She became pregnant and gave birth to a baby in February of 1966. During pregnancy Mrs. Gonzales was attended by Dr. Greenwood Wooten who also delivered the child. She was seen by Dr. Wooten ten to twelve times during gestation.

Mrs. Gonzales testified that during the months of her pregnancy and while under the care of Dr. Wooten she never mentioned to him the injury to her back or shoulder. She testified she did not tell Dr. Wooten about the injury because she did not "think about it."

At the time of the first examination by Dr. Mascarenhas, he detected muscle spasm, an objective symptom. Her other symptoms, such as tenderness and pain,

were subjective. Dr. Mascarenhas testified that the muscle spasm in Mrs. Gonzales' shoulder recurred from time to time during his examinations and treatment.

"But there were times," Dr. Mascarenhas stated, "she would come to the office she wouldn't have the muscle spasm, but she still would have the pain, that tenderness under pressure, you know, and the fact that she didn't have the spasm made me think that she was making progress. But sometimes the spasm would recur, well, then, your opinion would change as far as progress or so far as the speed of recovery, you know."

The muscle spasm was something the doctor could detect by pressure of the hand. Dr. Mascarenhas testified that sprained muscle was a common ailment, just about as common as a headache. The only record he made of a muscle spasm was on the initial visit, although he testified he found the spasm on other occasions. As already pointed out, Dr. Mascarenhas discontinued local anesthetics in December and did not use this measure for pain relief in the period ending April 13 when treatment ceased altogether.

Mrs. Gonzales was examined on two occasions at the request of appellee by Dr. Frederick Lowry, a recognized orthopedic surgeon. The first examination was in December, 1964, while Mrs. Gonzales was under treatment by Dr. Mascarenhas. Dr. Lowry found her normal in every respect except the subjective symptom of tenderness along the inner border of the right shoulder blade. He found no muscle spasm. In the light of her relation to him of the injury, Dr. Lowry diagnosed Mrs. Gonzales' condition near the shoulder blade to be "a local inflammation of muscle secondary to a trauma, to an injury."

Dr. Lowry examined Mrs. Gonzales the second time on January 12, 1966. On that occasion the doctor found no tenderness in the area of the shoulder blade, no tenderness over the bone, and no muscle spasm anywhere. "There was a full range of motion of the shoulders and in all joints in the upper extremities," Dr. Lowry testified. "She was able," Dr. Lowry stated, "to shrug her shoulders against resistence, and this was not painful. There was full motion in the dorsal spine." No abnormalities were disclosed in this examination.

Mrs. Gonzales testified that on the day of trial in June, 1966, she was in "terrible pain," that there had been "no improvement" from the day of her injury, and that she thought her condition was "going to be for the rest of my life." Juan Gonzales, her husband, testified to consistent pain appellant had had throughout their marriage.

The general rule is that the testimony of an interested witness, such as a party to a suit, even though not contradicted, does no more than raise a fact issue to be decided by the jury. Pope v. Beauchamp, 110 Tex. 271, 219 S.W. 447. An exception to this rule arises where the testimony of the interested witness is not contradicted by other witnesses, or attendant circumstances, and the testimony is clear, direct, and positive, and free from contradictions, inconsistencies, and circumstances tending to cast suspicion upon it. Only in such an exceptional instance must the testimony be taken as true as a matter of law. Cochran v. Wool Growers Central Storage Co., 140 Tex. 184, 166 S.W.2d 904; Springfield Fire & Marine Ins. Co. v. Cameron & Co., Tex.Civ.App., Waco, 96 S.W.2d 788 (no writ); Fowler v. Texas Employers' Ins. Ass'n., Tex.Civ.App., Fort Worth, 237 S.W.2d 373 (writ ref.).

It was the province of the jury to weigh all the evidence and to decide what credence should be given to the whole, or to any part, of the testimony of each witness. It is basic that the jurors, sitting as a jury, are judges not only of the facts proved, but of the inferences to be drawn

from the facts, provided the inferences are not unreasonable. Lockley v. Page, 142 Tex. 594, 180 S.W.2d 616 (Tex.Comm. App. 1944, opinion adopted by Sup.Ct.).

The jury heard Mrs. Gonzales and her husband, Juan Gonzales, and the doctor who treated Mrs. Gonzales after she was injured, Dr. Raul B. Mascarenhas. The jury also heard Dr. Frederick Lowry, who had examined Mrs. Gonzales on two occasions, and Dr. Greenwood Wooten, who had seen Mrs. Gonzales ten to twelve times during her pregnancy and had delivered her baby. Documentary proof included Dr. Mascarenhas' detailed statement for medical services, his written report of examination and diagnosis, and the written report of Dr. Lowry.

It is undisputed that Mrs. Gonzales did not work at any time during the period she was under treatment, except for two or three hours on Monday following her injury when she had to stop work because of severe pain. During the first seventeen to eighteen weeks after her injury appellant was under concentrated treatment by Dr. Mascarenhas. Between August 18, when she was hurt, and December 30, when she received the last "procaine infiltration" to relieve pain, she was treated by the doctor sixty-four times and received seventeen injections for pain relief. For at least this period of time it seems improbable that appellant had an appreciable earning capacity.

■ We have carefully examined the record and conclude that there was sufficient evidence to support the jury's finding that appellant suffered partial disability for a period of seventeen weeks.

The finding by the jury that during her period of partial incapacity appellant had an average weekly wage earning capacity of $50 is not sufficiently supported by the evidence.

Appellant's eleventh and last point of error is stated in full:

"In its proper setting, the effect of the testimony of Dr. Mascarenhas, elicited by counsel for defendant, regarding the doctor's membership in the Travis County Medical Society and the Texas Medical Society was reasonably calculated to cause such prejudice to appellant's cause, that an instruction by the Court could not eliminate the probability that it would result in an unjust and improper verdict."

We do not find anything in the record to show that Dr. Mascarenhas was questioned about his membership in the Texas Medical Society. He was questioned, however, regarding his membership in the Travis County Medical Society.

On direct examination by counsel for appellant, Dr. Mascarenhas testified in the course of being qualified, that he was educated in medical school at Monterrey, Mexico, served an internship at Takoma Park, Maryland, and did social work as a doctor in Mexico. He further testified that he returned to the United States and started practice in Buda, Texas, on a temporary license. He left Buda and went to Washington, D. C., where he worked for about a year in a hospital and in the State Department. He began practice in Austin, Texas, in December, 1961, and in December, 1965, he moved to Cameron, Texas.

At this point counsel for appellant asked Dr. Mascarenhas whether he was a member of the American Medical Association. The doctor's answer to his question was not responsive as to the American Medical Association. The doctor stated, "I was a member of the local society here [Austin, Travis County], and since I moved to Cameron I am not a member any more. I have an application in the local society there pending."

Subsequently, on cross examination by counsel for appellee, Dr. Mascarenhas was asked about his membership in the Travis County Medical Society. The entire examination of Dr. Mascarenhas by counsel

for appellee on the matter is set out as follows:

"Q Now, Doctor, at the time you were treating her, [Mrs. Gonzales] you were not a member of the Travis County Medical Society, were you?

A I don't remember if I—I was a member of the Medical Society, but I don't remember as of that time whether I was or not.

Q When were you a member of the Travis County Medical Society?

A My membership started out, I think it was either February or March of 1962.

Q And then when were you no longer a member?

MR. LEE: May it please the Court, may I approach the Bench with counsel for a second?

Conference at the Bench between Court and counsel out of hearing of the reporter.

Q Sometime prior to the time that you began to see Mrs. Gonzales you were not a member of the Travis County Medical Society; isn't that correct?

A I was suspended from membership, and I appealed the decision of the local society to the Texas Medical Association, and I lost. Then I appealed to the Judicial Council of the American Medical Association, and they reversed in my favor, and the local society refused to accept the decision of the Judicial Council of the American Medical Association; and the only solution I had, since they refused to accept the decision of the Judicial Council, was to have to move to another county.

Q All right, sir.

A And the decision of the local society had nothing to do with my ability as a physician or my character or nothing to do with my professional ability or my ethics. It was based on something else, and if you go into this, it is going to take a whole day to explain that.

Q Well, I didn't even mean to go that far. I was just getting to the point that at the time you were seeing her, you weren't a member of the Travis County Medical Society.

A When I started seeing her was in—

Q August of '64.

A Let's see—technically I still was a member, because as long as—their decision was pending and I was appealing; I was technically a member, yes, sir. And that decision of of the Judicial Council of the American Medical Association didn't come, I think, until September, and I started treating her in August. When I started treating her I was still technically a member of the Medical Society.

Q All right. But during that time they didn't allow you to practice in the local hospitals; is that correct—Seton and Brackenridge?

A I always been a member of Brackenridge Hospital.

Q What about Seton?

A I never applied for membership in Seton anyway.

Q All right. I believe that is all."

The record does not disclose that any objection to this line of questioning was made by counsel for appellant at the time Dr. Mascarenhas was under interrogation.

It appears that objection to this examination was made for the first time in a motion for mistrial after the jury had returned a verdict. The matter was presented a second time in appellant's second motion for rehearing. The trial court overruled the

motion for mistrial and the motion for rehearing.

In support, and by way of clarification, of the phrase "in its proper setting" used in the assignment of error, appellant argues certain other matters which she seeks to link with the cross examination of Dr. Mascarenhas to show a chain of events so prejudicial as to cause the jury to reach "an unjust and improper verdict."

These other matters, stated briefly, appear to be four in number.

First, counsel for appellee, when questioning the jury panel prior to selection of a jury, asked whether the panel members knew certain named doctors. Counsel for appellant filed a bill of exceptions stating that the objection had been made and overruled, and exception was taken because the panel had been told appellant would call these doctors to testify. The trial court granted the exception but modified it by stating that counsel for appellee possibly had said the named doctors might testify, but the court did not hear counsel say they would.

Second, counsel for appellee stressed when examining Juan Gonzales, appellant's husband, that appellant "had been seen by Dr. Wooten, Dr. Ross, Dr. Prewett, and Dr. Lowry, as well as Dr. Mascarenhas." The record does not show that counsel for appellant interposed any objection at the time to this examination or to any question asked in the course of such examination.

Third, counsel for appellee in examination of Dr. Mascarenhas asked the doctor whether he knew Dr. Ross and Dr. Lowry and in what field of practice they specialized. The objection appears to be that this testimony tended to show that Drs. Ross and Lowry were specialists, orthopedic surgeons, and that Dr. Mascarenhas was a general practitioner, not a specialist. The objection seems to include further the fact that counsel for appellee in cross examination of Mrs. Gonzales "reiterates on the doctors that have seen Plaintiff, and the

time when they saw her, and reviewed generally her medical history." We have carefully examined the record and find no objection by counsel for appellant at the time the testimony under this heading was being developed from the witness stand. Counsel objected once to "repetitive" testimony relating to the specialty and capacity of Dr. Lowry. The court overruled the objection, and counsel did not except.

Fourth, counsel for appellee argued to the jury, "Why hasn't Mr. Lee brought Dr. Ross to the stand if he had found anything wrong with her? We don't know what Dr. Ross found. Why didn't he bring Dr. Ross to testify?" In rebuttal argument, counsel for appellant offered appellee's counsel a written report from Dr. Ross and offered to permit appellee to introduce the report in evidence. Appellant's counsel stated there were many reasons Dr. Ross was unavailable for trial. Counsel for appellee objected to this remark, and the court admonished counsel for both parties to stay within the record.

On direct examination, Dr. Mascarenhas had been questioned in detail regarding his education and experience to establish his qualification. He was asked about his membership in the American Medical Association. The examination of Dr. Mascarenhas on cross examination, touching upon the same subjects, was proper and within the rules controlling such examination. If counsel for appellant had any objection, it was not timely made and was waived. Guerra v. Texas Employers Insurance Ass'n., Tex.Civ.App., San Antonio, 343 S.W.2d 306 (no writ).

The four incidents of trial which appellant argues provide "proper setting" to transmute the testimony of Dr. Mascarenhas into prejudicial error by the jury are not separately assigned as error in this appeal. We have examined the record of these incidents which we have already described in detail. We can find nothing in them, even when viewed as a link between the

cross examination of Dr. Mascarenhas and the findings of the jury, which would justify disturbing the judgment of the trial court.

■ It is not only customary, but it is a part of sound advocacy for counsel to ask prospective jurors whether they are acquainted with persons, in this case doctors, who might be witnesses at the trial.

■ The objection now that appellant's husband was asked about five different doctors who had examined or treated his wife is without merit. We do not find that counsel for appellee "stressed" these facts in his examination, since the matter was covered in less than twenty questions. The examination appears proper, and no objection to it was made at the time.

■ We find nothing improper in showing by Dr. Mascarenhas that Dr. Lowry and Dr. Ross were by him considered qualified doctors and specialists in medicine as "bone men." If any of this testimony was considered improper or inadmissible by appellant's counsel, he had the opportunity to interpose his objection.

■ The argument of counsel to the jury, regarding appellant's failure to call Dr. Ross as a witness, was permissible. It was shown at the trial that Dr. Ross had examined Mrs. Gonzales "not too long ago" before the trial. There was no evidence before the jury as to why Dr. Ross was not at the trial. It was not improper for counsel for appellee to comment in argument on the unexplained failure of appellant to call Dr. Ross. Tex-Jersey Oil Corporation v. Beck, 157 Tex. 541, 305 S.W.2d 162.

In support of her contention that these instances, taken in "proper setting," constitute error, appellant relies upon authorities for the proposition that several improper acts will require reversal even though no one instance would be sufficient by itself to bring about such result. In each of the cases cited by appellant each separate instance was improper.

Repeated personal references to opposing counsel, including the fact he was from another county and represented a corporation, were improper and had nothing to do with a just solution of the issues. Smerke v. Office Equipment Co., 138 Tex. 236, 158 S.W.2d 302 (Tex.Comm.App., 1941, opinion adopted by Sup.Ct.).

Several improper jury arguments, taken together, constituted reversible error, even though any one instance of itself would not be sufficient to cause reversal. National Surety Corporation v. Moore, Tex.Civ. App., Dallas, 386 S.W.2d 327 (writ ref., n. r. e.).

Where counsel persisted in propounding improper questions, not to secure information, but to prejudice and poison the minds of the jurors, the court may order a mistrail. Morrow v. United States, U.S.C.A., 7th Cir., 101 F.2d 654.

An underlying principle of these cases is that the incidents and conduct of counsel found to be improper were without relation to the merits of the case being tried.

In Smerke v. Office Equipment Co., supra, the several instances of improper conduct of counsel were coupled with an argument to the jury concerning failure to call a doctor as a witness. The Court found the error to lie in the fact counsel attempted to tell the jury what the doctor's testimony would be, but the court observed, "We think it was the right of defendant's counsel to call attention of the jury to Dr. Saunders' failure to testify." 158 S.W.2d 302, 305, col. 1.

We find these and the other authorities upon which appellant relies under this point of error are without application to the facts of this case. The assignment of error is overruled.

The judgment of the district court in this cause is reversed and remanded for trial.

Reversed and remanded.

## ON MOTION FOR REHEARING

Appellant assigned as error that the overwhelming preponderance of the evidence was contrary to the finding of the jury to the effect that appellant's average weekly earning capacity during the period of partial incapacity was $50 and that the finding was manifestly unjust. After reviewing all of the evidence, we decided that the jury's finding was so against the weight and preponderance of the evidence as to be clearly wrong and we sustained the assignment.

The cause should be remanded for the reasons stated, and motion for rehearing is overruled.

Motion overruled.